UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
-------------------------------------------------------------X
Faroulh Dorlette,

                          Plaintiff,        **RULING**

        -against-                  Case No. 11-cv-1461 (TLM)


Dave Butkiewicus, et al.,

                          Defendants
-------------------------------------------------------------X


      Before the Court is the Motion for Summary Judgment [Rec. Doc. 54] and Memorandum

of Law in Support [Rec. Doc. 54-23] filed by defendants David Butkiewicus, Jeffrey McGill,

Bradley Guertin, John Frasco, Mark Tourangeau, Frederick Levesque, Stephen Clapp, Kristan

Mangiafico, Mary Marcial, Scott Salius, Brian Bradway, Theresa Lantz, Brian Murphy, Valerie

Light, and Lynn Milling (together, "Defendants"), and the Brief in Opposition to Defendants'

Motion for Summary Judgment [Rec. Doc. 62] filed by *pro se* plaintiff Faroulh Dorlette.  For the

reasons set forth below, Defendants' Motion for Summary Judgment will be granted.  All of

Plaintiff's claims will be dismissed with prejudice.

## I.  FACTUAL BACKGROUND

      On December 17, 2007, Plaintiff Faroulh Dorlette, an inmate in the custody of the

Connecticut Department of Correction (hereinafter "DOC"), was transferred to Northern

Correctional Institution (hereinafter "NCI"), where he was housed in the facility's close custody

unit. Def. 56.1 St. ¶¶ 5, 23 [Rec. Doc. 54-29, at 2, 4].  NCI, a level-five maximum security

institution, is designated to manage inmates who have demonstrated that they pose a threat to the

safety of the community, staff, and other inmates. *Id.* ¶ 13 [Rec. Doc. 54-29, at 3].  The close

custody unit in particular is a housing unit at NCI which houses inmates classified as security

risk group members, *id.* ¶ 16, which the DOC recognizes as members of "discrete entit[ies]" of inmates who possess common characteristics and together represent a threat to other individuals at the facility. *Id.* ¶¶ 19-21 [Rec. Doc. 54-29, at 4]. Plaintiff has been classified as a security risk group member in the DOC system since 2002. *Id.* ¶ 22.

On May 6, 2008, Plaintiff was transferred to the close custody unit run by defendant Butkiewicus, Dorlette Aff. ¶ 3 [Rec. Doc. 62-6, at 10], a Correctional Captain at NCI. Butkiewicus Aff. ¶¶ 4-5 [Rec. Doc. 54-18, at 2]. Plaintiff alleges that immediately upon his May 6 transfer into Butkiewicus' unit, Butkiewicus began a campaign to harass and intimidate Plaintiff, accusing him of an intent to "cause trouble," threatening to "ship" him "out of state," and stating that he planned to "give a few inmates incentives to make something up" to accomplish this plan. Dorlette Aff. ¶ 3 [Rec. Doc. 62-6, at 10]. Plaintiff further alleges that Butkiewicus told him at their initial meeting that Butkiewicus would blame Plaintiff for "whatever happens in [Butkiewicus'] unit." *Id.* [Rec. Doc. 62-6, at 10-11]. Plaintiff asserts that this campaign of harassment and intimidation continued over the course of the next month. *Id.* ¶ 4 [Rec. Doc. 62-6, at 11]. During these confrontations, Plaintiff claims he repeatedly told Butkiewicus he had no intention to cause trouble, but that Butkiewicus' "tough talk" did not scare him. *Id.* ¶ 3 [Rec. Doc. 62-6, at 10-11]. Plaintiff's responses allegedly caused Butkiewicus to "become even more aggravated" and issue still more threats about transferring Plaintiff out of state. *Id.* ¶¶ 3-4 [Rec. Doc. 62-6, at 11]. Over the course of this month, Plaintiff attests that he informed defendant Warden McGill of Butkiewicus' continued "threatening and harassing conduct." *Id.* ¶ 6 [Rec. Doc. 62-6, at 12]. In response, Plaintiff claims that McGill told him to stop complaining about Butkiewicus and warned Plaintiff that Butkiewicus can "do what he pleases in his unit." *Id.*

Butkiewicus attests that he followed normal procedure in speaking with Plaintiff upon Plaintiff's entrance into his unit; during their initial conversation, Butkiewicus informed Plaintiff that he knew Plaintiff was a "high ranking" and "influential" member of a security risk group, that because of this designation Butkiewicus would be "closely monitoring [Plaintiff's] activities in the unit," and that he would hold Plaintiff "accountable for his actions." Butkiewicus Aff. ¶¶ 18-19 [Rec. Doc. 54-18, at 4]. Butkiewicus disputes that he ever threatened to have Plaintiff "shipped out of state" for any wrongdoing that occurred in the unit. *Id.* ¶ 20.

On June 3, 2008, an inmate was assaulted by two other inmates in NCI's recreation yard. Def. 56.1 St. ¶ 28 [Rec. Doc. 54-29, at 5]. Butkiewicus investigated the incident and helped prepare an incident report package. *Id.* ¶¶ 29-30; *see* June 3, 2008 Connecticut DOC Incident Report Package ("Incident Report Package") [Rec. Doc. 54-7]. Using the information obtained during the investigation—some of which Butkiewicus attests was obtained from confidential informants at NCI—Butkiewicus concluded that Plaintiff had orchestrated the assault on the inmate in the recreation yard. Def. 56.1 St. ¶¶ 31-32 [Rec. Doc. 54-29, at 5]. Plaintiff attests that he was summoned to Butkiewicus' office on June 4, at which time Butkiewicus "demanded" that Plaintiff give him information about the June 3 assault, including the names of the perpetrators. Dorlette Aff. ¶ 5 [Rec. Doc. 62-6, at 11]. Plaintiff claims that he told Butkiewicus that he "had no knowledge as to the facts of the alleged fight," that any fight that had occurred was "none of [Plaintiff's] business," and that he was "not a snitch." *Id.* Plaintiff maintains that these responses greatly upset Butkiewicus, who told Plaintiff that he would "pay the cost" for his unwillingness to cooperate and for his back-talking by being transferred to administrative segregation. *Id.* [Rec. Doc. 62-6, at 11-12]. Plaintiff also claims that Butkiewicus badgered him for "snitching" to Warden McGill about the series of confrontations the pair had during the past month. *Id.* On

June 4, 2008, Plaintiff was transferred from the close custody unit to NCI's administrative segregation program. *Id.* ¶ 7 [Rec. Doc. 62-6, at 13].

According to Connecticut's prison regulations, administrative segregation is for inmates "whose behavior or management factors pose a threat to the security of the facility or a risk to the safety of staff or other inmates," and is resorted to if the "inmate can no longer be safely managed in general population." Connecticut DOC Administrative Directive ("Admin. Directive") 9.4, § 3(B) [Rec. Doc. 54-11, at 2]. Once placed in administrative segregation, an inmate must successfully complete three separate phases by complying with all disciplinary and programming requirements before becoming eligible for removal from the program. Salius Aff. ¶¶ 13-14 [Rec. Doc. 54-20, at 4]. Progression through the phases "depends upon the inmate's behavior": if the inmate "remains free of any additional disciplinary issues and shows initiative in completing the program," he can advance through the phases and complete the program "in approximately one year." *Id.* ¶ 17. "Conversely, inmates who continue to accumulate disciplinary reports, who refuse to cooperate with programming, or who otherwise continue to present management issues due to their poor behavior" will not progress as quickly and are in danger of being "regressed back to phase one, if warranted." *Id.* ¶ 18. While confined in administrative segregation, inmates are subject to a broad range of pre-set provisions that regulate searches of their cells, security checks, their freedom of movement, work assignments, recreation, personal property, visitation rights, telephone and television usage, and their receipt of mail, among other aspects of their daily life. *See* Admin. Directive 9.4, Attachments A/1-A/4 [Rec. Doc. 54-11, at 27-30].

The authorization of an inmate's confinement to administrative segregation is "at the discretion of the [DOC's] Director of Offender Classification and Population Management." *Id.*

§ 12 [Rec. Doc. 54-11, at 8]. Directive 9.4 requires that prior to authorization for phase one of administrative segregation, an inmate shall receive "notice and a hearing" that comply with the specific procedures outlined in § 12 of the Directive. *Id.*; *see id.* §§ 12(A), 12(B) [Rec. Doc. 54-11, at 8-9] (outlining the notice and hearing procedures). Following the hearing, the hearing officer is to provide a written recommendation that includes the information he relied upon and the rationale behind his recommendation. *Id.* § 12(C) [Rec. Doc. 54-11, at 9]. The Director of Offender Classification and Population Management makes the final decision authorizing an inmate's confinement to the DOC's administrative segregation program. *Id.* § 12(D).

After Plaintiff's transfer on June 4, 2008, NCI officials initiated the procedures outlined by § 12 of Directive 9.4 to determine whether Plaintiff should be formally authorized for placement into the administrative segregation program. On July 3, a hearing was conducted in front of defendant Hearing Officer Clapp. Dorlette Aff. ¶ 11 [Rec. Doc. 62-7, at 3]; Def. 56.1 St. ¶ 48 [Rec. Doc. 54-29, at 8]. Following the hearing, Clapp recommended Plaintiff be placed on administrative segregation status. Def. 56.1 St. ¶ 52 [Rec. Doc. 54-29, at 8].[1] On July 8, defendant Levesque, DOC's Director of Offender Classification and Population Management, formally authorized Plaintiff's placement in administrative segregation. *Id.* ¶ 54; *see* 2008 Hearing Package [Rec. Doc. 54-8, at 4, 9-10]. Plaintiff remained in administrative segregation until December 5, 2008, at which time he was discharged from the custody of the DOC. Dorlette Aff. ¶ 17 [Rec. Doc. 62-7, at 11]; Def. 56.1 St. ¶ 58 [Rec. Doc. 54-29, at 9]. At that time,

---

[1] Plaintiff's Affidavit also alleges that defendant Mangiafico served as a hearing officer and that she recommended Plaintiff's placement in administrative segregation. Dorlette Aff. ¶ 11 [Rec. Doc. 62-7, at 3-4]. Mangiafico attested that at Plaintiff's July 2008 hearing, she served in the capacity of a recording officer, and her duties included ensuring that the hearing officer followed the DOC's hearing procedures. Mangiafico Aff. ¶¶ 9-12 [Rec. Doc. 54-17, at 3-4]. Other than Plaintiff conclusorily labeling Mangiafico a "hearing officer," there is no evidence in the record that she served as a hearing officer, rather than a recording officer, at the July 3 hearing. *See* July 2008 Restrictive Status Report of Hearing for Placement or Removal ("2008 Hearing Package") [Rec. Doc. 54-8, at 4].

Plaintiff had not progressed beyond phase one of the program. Def. 56.1 St. ¶ 58 [Rec. Doc. 54-29, at 9].

On December 24, 2008, Plaintiff was arrested and returned to DOC custody. Dorlette Aff. ¶ 18 [Rec. Doc. 62-7, at 11]. Plaintiff was housed at Bridgeport Correctional Center (hereinafter "BCC") for six days until he was transferred back to administrative segregation at NCI on December 30, 2008. *Id.*; Salius Aff. ¶¶ 35-36 [Rec. Doc. 54-20, at 7-8]. On January 15, 2009, a hearing was conducted to determine whether Plaintiff should be formally readmitted to the administrative segregation program. Dorlette Aff. ¶ 19 [Rec. Doc. 62-8, at 2]; Def. 56.1 St. ¶¶ 64, 73 [Rec. Doc. 54-29, at 10, 11]. After the hearing, defendant Clapp, again serving as the hearing officer, recommended Plaintiff's readmission to administrative segregation. Dorlette Aff. ¶ 19 [Rec. Doc. 62-8, at 2]; Def. 56.1 St. ¶ 78 [Rec. Doc. 54-29, at 11].[2] On January 26, 2009, Director Levesque formally authorized Plaintiff's readmission into the segregation program. Def. 56.1 St. ¶ 80 [Rec. Doc. 54-29, at 12]. Plaintiff attests that he remained in segregation until "the end of July early August 2009." Dorlette Aff. ¶ 20 [Rec. Doc. 62-8, at 3].[3] Plaintiff was returned to the close custody program at this time in accordance with DOC policy. Def. 56.1 St. ¶ 84 [Rec. Doc. 54-29, at 12].

In 2011, Plaintiff filed this suit *pro se* under 42 U.S.C. § 1983 alleging violations of his rights under the Eighth and Fourteenth Amendments. Compl. [Rec. Doc. 1]. He filed a verified Amended Complaint on November 5, 2012. Am. Compl. [Rec. Doc. 30]. Plaintiff brought a claim for retaliation against Butkiewicus and a conspiracy claim against Butkiewicus and

---

[2] Plaintiff again alleges that defendant Mangiafico served as a hearing officer, while Mangiafico attested that she again served in the capacity of recording officer. Mangiafico Aff. ¶ 9 [Rec. Doc. 54-17, at 3]. Plaintiff has not offered any evidence regarding Mangiafico's role other than his conclusory assertion.

[3] The exact date of Plaintiff's removal from administrative segregation in 2009 is unclear from the record. Defendants state that Plaintiff was removed from segregation "on or about July, 2009." Def. 56.1 St. ¶ 82 [Rec. Doc. 54-29, at 12].

McGill. Plaintiff also brought due process claims against these two individuals and against thirteen additional officials at NCI: Correctional Counselor Guertin, Correctional Treatment Officer Frasco, Inmate Advocate Tourangeau, Director Levesque, Correctional Counselor Supervisor Clapp, Correctional Counselor Mangiafico, Director Marcial, Correctional Captain Salius, Correctional Counselor Supervisor Bradway, Commissioner of Correction Lantz, Deputy Commissioner of Correction Murphy, Major Light, and Milling. Am. Compl. ¶¶ 9-16 [Rec. Doc. 30, at 3-4].[4] Plaintiff alleges that the fifteen individuals participated in various due process violations while conducting the procedures that led to both his initial confinement to administrative segregation in July 2008 and his readmission to segregation in January 2009. Plaintiff brought additional claims challenging the conditions of his confinement during his time in administrative segregation, contending that the conditions he faced during both periods in the program were "cruel and unusual."

Defendants filed their Answer to Plaintiff's Amended Complaint on December 31, 2012, [Rec. Doc. 42], and filed their Motion for Summary Judgment [Rec. Doc. 54], Memorandum of Law in Support [Rec. Doc. 54-23], and accompanying exhibits on January 31, 2013. Plaintiff, still appearing *pro se*, filed his Brief in Opposition to Defendants' Motion for Summary Judgment [Rec. Doc. 62], Affidavit [Rec. Docs. 62-6, 62-7, 62-8, 62-9], and accompanying exhibits on April 12, 2013. Defendants did not file a reply memorandum.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when the record reflects that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Such a determination is to be made after "construing the evidence in the light most

---

[4] Plaintiff's Opposition Memorandum states that he "hereby abandons his claims (all) against defendant Milling." Pl. Opp'n Mem. [Rec. Doc. 62-2, at 22 n.3]. Accordingly, the Court will grant summary judgment in favor of defendant Milling on all claims against her.

favorable to the nonmoving party and drawing all reasonable inferences in that party's favor." *Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 558 (2d Cir. 2012). Initially, the party moving for summary judgment must demonstrate the absence of any genuine issues of material fact. When a party seeking summary judgment bears the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if such evidence were uncontroverted at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). As to issues for which the non-moving party has the burden of proof at trial, the moving party must satisfy this burden by demonstrating the absence of evidence supporting the non-moving party's claim, and if the moving party succeeds the burden shifts to the non-moving party to show that there is a genuine issue for trial. *Id.* at 322-23.

Once the burden shifts to the non-moving party, it must direct the attention of the court to evidence in the record and set forth specific facts sufficient to establish that there is a genuine issue of material fact requiring a trial. *Id.* at 324. The non-moving party may not rest on mere allegations or denials of the adverse party's pleadings as a means of establishing a genuine issue worthy of trial, but must demonstrate by affidavit or other admissible evidence that there are genuine issues of material fact or law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159 (1970). A "verified complaint is to be treated as an affidavit for summary judgment purposes" and "can be considered in determining whether material issues of fact exist." *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995). There is no genuine issue of material fact if, viewing the evidence in the light most favorable to the non-moving party, no reasonable trier of fact could find for the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If no issue of fact is presented

and if the movant is entitled to judgment as a matter of law, the court is required to render the judgment as prayed for. Fed. R. Civ. P. 56(a); *Celotex Corp.*, 477 U.S. at 322.

It is well-settled that "*pro se* submissions are 'held to less stringent standards than formal pleadings drafted by lawyers' . . . particularly when allegations concern civil rights violations." *Dowdy v. Hercules*, 2010 WL 169624, at *2 (E.D.N.Y. Jan. 15, 2010) (internal citations omitted). The Court therefore construes Plaintiff's submissions "liberally" and interprets them as "raising the strongest arguments [they] suggest[]." *Id.* (citing *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474-75 (2d Cir. 2006)); *see Carr v. Canty*, 2012 WL 3578742, at *2 (S.D.N.Y. Aug. 16, 2012) (citing cases). However, the "application of this forgiving standard for *pro se* litigants . . . 'does not relieve [the] plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment.'" *Caractor v. City of N.Y. Dep't of Homeless Servs.*, 2013 WL 2922436, at *4 (S.D.N.Y. June 14, 2013) (quoting *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003)).

## III. LAW AND ANALYSIS

Plaintiff brings his Eighth and Fourteenth Amendment claims under 42 U.S.C. § 1983. Section 1983 "does not create any independent substantive right, but rather is a vehicle to 'redress . . . the deprivation of [federal] rights established elsewhere.'" *Butler v. Suffolk County Police Dep't*, 2013 WL 3189190, at *2 (E.D.N.Y. June 20, 2013) (alterations in original) (quoting *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999)). A claim under § 1983 has "two essential elements: (i) the defendant acted under color of state law; and (ii) as a result of the defendant's actions, the plaintiff suffered a denial of her federal statutory rights, or her constitutional rights or privileges." *Sulkowska v. City of N.Y.*, 129 F. Supp. 2d 274, 286 (S.D.N.Y. 2001) (citing *Annis v. County of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998)). It is

well-settled that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citing cases). A supervisory official defendant cannot "be held liable for damages for constitutional violations merely because he held a high position of authority." *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996).[5]

Except as noted, Defendants moved for summary judgment against Plaintiff's Eighth and Fourteenth Amendment claims on a variety of bases discussed below.

## A. DEFENDANTS' ELEVENTH AMENDMENT DEFENSE

Defendants first argue that "insofar as this is a claim for money damages against the defendants in their official capacities," the Eleventh Amendment bars those claims. Def. Mem. [Rec. Doc. 54-23, at 5-6]. Plaintiff's Amended Complaint does not indicate that he seeks money damages from any of the defendants in their official, as opposed to their individual, capacities. Indeed, Plaintiff's Opposition Memorandum contends that he "has not sued defendants in their official capacities for money damages." Pl. Opp'n Mem. [Rec. Doc. 62-1, at 4]. "As there is no official capacity claim for money damages, the defendants' motion for summary judgment is denied on this ground." *Alston v. Butkiewicus*, 2012 WL 6093887, at *8 (D. Conn. Dec. 7, 2012).

---

[5] The "pertinent legal standards" governing personal involvement and supervisory liability in the Second Circuit are "currently in some flux." *Hodge v. Sidorowicz*, 2011 WL 6778524, at *15 (S.D.N.Y. Dec. 20, 2011) (Report and Recommendation), *adopted sub nom. Hodge v. Wladyslaw*, 2012 WL 701150 (S.D.N.Y. Mar. 6, 2012). As the Second Circuit recently observed, the United States Supreme Court's 2009 decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) "engendered conflict within [the] Circuit about the continuing vitality of the supervisory liability test set forth in *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)." *Reynolds v. Barrett*, 685 F.3d 193, 205 n.14 (2d Cir. 2012). Defendants contend that the five categories of supervisory liability set forth in *Colon* were modified by *Iqbal, see* Def. Mem. [Rec. Doc. 54-23, at 11-12], while Plaintiff argues that the *Colon* categories were "unaffected" by *Iqbal. See* Pl. Opp'n Mem. [Rec. Doc. 62-2, at 23]. The Court need not determine the fate of the *Colon* categories in the wake of *Iqbal* because for all claims on which Defendants move for summary judgment on the basis that the defendants were not "personally involved," Plaintiff's claims fail under either standard.

## B. DEFENDANTS' STATUTE OF LIMITATIONS DEFENSE

Defendants next argue that "any claims raised by the plaintiff for actions that are alleged to have occurred prior to September 11, 2008, are barred by the statute of limitations" because Plaintiff's "initial complaint was filed on September 11, 2011." Def. Mem. [Rec. Doc. 54-23, at 6]. Defendants assert that application of the statute of limitations would bar (1) Plaintiff's retaliation claim, (2) his due process claims related to his July 2008 administrative segregation classification and transfer, (3) his due process claims related to his post-hearing appeals of his July 2008 transfer, and (4) all supervisory liability claims stemming from the retaliation claim and the July 2008 due process claims. *Id.* at 6-8. Plaintiff contends that the statute of limitations defense does not bar his "pre-September 11, 2008 claims" for two reasons: first, July 20, 2011, rather than September 11, 2011, is the date on which his initial Complaint should be deemed filed; and second, the limitations period tolled for at least ninety days as he exhausted his administrative remedies in NCI's grievance system. Pl. Opp'n Mem. [Rec. Doc. 62-1, at 5].[6] For the reasons that follow, the Defendants' Motion for Summary Judgment on their statute of limitations defense is denied.

### 1. The Limitations Period

The docket sheet in this proceeding indicates that Plaintiff's initial handwritten Complaint was filed September 21, 2011, which matches the date of the clerk's "filed" stamp on

---

[6] Plaintiff argues that Defendants forfeited any defense based on the statute of limitations by failing to raise this affirmative defense when answering his Amended Complaint. Pl. Opp'n Mem. [Rec. Doc. 62-1, at 5]. Plaintiff correctly points out that Defendants did not include a statute of limitations affirmative defense among the six affirmative defenses they pleaded in their Answer to Plaintiff's Amended Complaint. [Rec. Doc. 42]. The statute of limitations defense was, however, included in Defendants' Answer to Plaintiff's original Complaint. [Rec. Doc. 25, at 3]. The Second Circuit has previously recognized that "[w]aiver of affirmative defenses not raised in a defendant's answer is not automatic, and 'as a practical matter there are numerous exceptions.'" *Gilmore v. Gilmore*, 503 F. App'x 97, 99 (2d Cir. Nov. 28, 2012) (summary order) (quoting *Am. Fed. Group, Ltd. v. Rothenberg*, 136 F.3d 897, 910 (2d Cir. 1998)). As the Court will deny the statute of limitations defense on other grounds discussed *infra*, the Court need not determine whether Defendants' failure to raise this defense for a second time in its Answer to Plaintiff's Amended Complaint precludes granting summary judgment in their favor on this ground.

the first page of the PDF of the initial Complaint. *See* Compl. [Rec. Doc. 1, at 1]. The first page

of the Complaint itself, however, has a handwritten date of July 20, 2011, which is also the date

of the sworn verification executed by Plaintiff and appended to the end of the Complaint. *Id.* at 1,

15. Plaintiff asserts that on July 20, he "submitted [his] complaint to prison staff for mailing to

the court." Dorlette Aff. ¶ 23 [Rec. Doc. 62-8, at 5]. Plaintiff claims that his initial Complaint

was accompanied by a "motion to proceed as a poor person." *Id.* ¶ 24. In August, Plaintiff

"followed up with a phone call" to the court clerk for the federal district court in Bridgeport

because he had not "heard back from the court re [sic] a docket number." *Id.* ¶ 25. At this time,

he was informed by the clerk that the "complaint did not reflect in the PACER system." *Id.*

After requesting that the clerk search for his missing paperwork, Plaintiff claims that the papers

he originally gave to prison staff on July 20 were returned to him with a "notice from the court

that [he] needed to enclose a filing fee," an issue which he alleges should have been covered by

his "motion to proceed as a poor person." *Id.* ¶¶ 26-27. Plaintiff contends that he "immediately

re-sent the papers to the court" with the *in forma pauperis* motion again enclosed with his

Complaint. *Id.* ¶ 27. After Plaintiff resent the documents, the clerk accepted the papers and

formally opened the case. *Id.* ¶ 27. Defendants do not challenge Plaintiff's chronology as to the

filing of his Complaint, nor do they allege any facts of their own related to the course of events

leading to Plaintiff's filing his initial Complaint, other than contending that it was filed

September 11, 2011.[7]

---

[7] The first page of the Complaint has a "filed" stamp with a date of September 6, 2011, but this stamp is crossed out with an "X." Compl. [Rec. Doc. 1, at 1]. Plaintiff contends that September 6 was the date his initial Complaint was first received by the clerk's office, and that the clerk returned this document and his other papers to him accompanied by a notification that his submission was deficient. Pl. Opp'n Mem. [Rec. Doc. 62-1, at 8]. A second stamp reading September 21, 2011 on the first page of the Complaint is not crossed out. *See id.* It is unclear to the Court from where the Defendants plucked the September 11, 2011 date they contend is the date of Plaintiff's filing.

It is well-settled that the "date of filing a federal complaint by a *pro se* prisoner is, for statute of limitations purposes, the date of delivery to prison authorities." *Walker v. Jastremski*, 430 F.3d 560, 562 n.1 (2d Cir. 2005); *see Gibson v. City Municipality of N.Y.*, 692 F.3d 198, 201 n.3 (2d Cir. 2012). Defendants do not address the applicability of this well-settled rule, nor do they address the fact that Plaintiff's initial Complaint had a handwritten date of July 20, 2011. The Court therefore deems July 20, 2011, the date Plaintiff alleges he turned over his initial Complaint to prison authorities and the date written on the Complaint itself, as the relevant filing date for its statute of limitations analysis.

To determine the statute of limitations period for a § 1983 claim, "federal law looks to the law of the State in which the cause of action arose." *Wallace v. Kato*, 549 U.S. 384, 387 (2007). In Connecticut, a plaintiff must bring his § 1983 claim within three years of the date his claim accrues. *See Walker*, 430 F.3d at 562; *Lounsbury v. Jeffries*, 25 F.3d 131, 134 (2d Cir. 1994) (holding that three-year limitations period set out in Conn. Gen. Stat. § 52-577 governs the statute of limitations period for § 1983 claims in Connecticut). The earliest any of Plaintiff's cognizable claims[8] accrued was June 4, 2008, the date Plaintiff alleges that defendant Butkiewicus ordered his confinement to segregation in an "act of retaliation . . . against [him] for his free speech exercise." *See* Am. Compl. ¶ 20 [Rec. Doc. 30, at 5]; Dorlette Aff. ¶ 4 [Rec. Doc. 62-6, at 11].[9]

---

[8] For the reasons set forth *infra*, to the extent that Plaintiff alleges a stand-alone harassment claim separate and apart from his retaliation claim, the Court does not find such a claim cognizable.

[9] The "accrual date of a § 1983 cause of action is a question of federal law that is *not* resolved by reference to state law." *Wallace*, 549 U.S. at 388 (emphasis in original). "Aspects of § 1983 which are not governed by reference to state law are governed by federal rules conforming in general to common-law tort principles." *Id.* "Under those principles, it is the standard rule that [accrual occurs] when the plaintiff has a complete and present cause of action . . . that is, when the plaintiff can file suit and obtain relief." *Id.* (alteration in original) (internal citations and quotation marks omitted). Plaintiff's retaliation claim could not accrue until defendant Butkiewicus allegedly took the adverse action of transferring Plaintiff to administrative segregation on June 4, as it was only at this time that Plaintiff had a complete and present cause of action for retaliation.

## 2. Tolling of the Limitations Period

Plaintiff argues that this three-year period was tolled for the period of time that he attempted to exhaust his administrative remedies within Connecticut's DOC system. Pl. Opp'n Mem. [Rec. Doc. 62-1, at 8-11]. "Federal law now requires inmates to exhaust their administrative remedies before commencing" a § 1983 action regarding their prison conditions in federal court. *See Bourguignon v. Armstrong*, 2007 WL 2495230, at *2 (D. Conn. Aug. 28, 2007) (citing 42 U.S.C. § 1997e(a)).[10] In recognition of this exhaustion requirement, the Second Circuit held that the applicable statute of limitations in § 1983 prisoner suits must be "tolled while a prisoner completes the mandatory exhaustion process." *Gonzalez v. Hasty*, 651 F.3d 318, 323-24 (2d Cir. 2011). "[T]he date on which [the plaintiff] first raised his administrative claims demarcates the commencement of the period of time during which he was actively exhausting those claims." *Id.* at 324. The applicable statute of limitations is "tolled only during that exhaustion period and not during the period in between the accrual of those claims and when [the plaintiff] began the administrative remedy process." *Id.* "Proper exhaustion" of administrative remedies under § 1997e(a) requires completion of "all steps that the agency holds out." *Hernandez v. Coffey*, 582 F.3d 303, 305 (2d Cir. 2009) (quoting *Woodford v. Ngo*, 548 U.S. 81, 90 (2006)).

"The administrative remedies for the State of Connecticut Department of Correction are set forth in Administrative Directive 9.6, entitled Inmate Administrative Remedies." *Casiano v. Osborn Corr. Inst. Maint. Dep't*, 2013 WL 869676, at *2 (D. Conn. Mar. 7, 2013).

---

[10] The mandatory exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

> Pursuant to Administrative Directive 9.6, an inmate must first seek informal resolution of the issue. If informal resolution is unsuccessful, the inmate must file a Level 1 grievance. The Unit Administrator has thirty business days from receipt of the grievance to respond to it. If the Level 1 grievance is denied or if the Unit Administrator fails to timely respond to the grievance, the inmate must appeal the denial or failure to respond to Level 2. A District Administrator must respond to the Level 2 appeal within thirty business days of receipt of the appeal. Level 3 appeals are limited to certain types of grievances relating to department level policy, the integrity of the grievance procedure and untimely responses to Level 2 grievances. The Commissioner or his or her designee must respond to a Level 3 grievance appeal within thirty business days of receipt of the appeal.

*Id.*; *see* Admin. Directive 9.6, § 6, *available at* www.ct.gov/doc/LIB/doc/PDF/AD/ad0906.pdf.

Between each grievance level, an inmate has five days to file an appeal of the action taken—or lack thereof—at the previous level. *See* Admin Directive 9.6, § 6.

Plaintiff alleges that on June 18, 2008, he filed a "request" and received no response from prison staff. Dorlette Aff. ¶ 14 [Rec. Doc. 62-7, at 6]. He then alleges that he filed a Level 1 grievance, Level 2 grievance, and Level 3 grievance in accordance with Directive 9.6. *Id.* At each level, Plaintiff alleges that he did not receive any response from DOC officials and that he waited the requisite thirty-day period before attempting to appeal to the next grievance level. *Id.*[11] As Plaintiff was required to exhaust the DOC's inmate grievance procedure in order to file a § 1983 claim in federal court, the applicable three-year statute of limitations must be tolled while he "complete[d] the mandatory exhaustion process." *Gonzalez*, 651 F.3d at 323-24. Here, the limitations period for each of Plaintiff's § 1983 claims was tolled for a minimum of ninety days

---

[11] Although Defendants' Answer to Plaintiff's Amended Complaint alleged that Plaintiff failed to exhaust his administrative remedies prior to bringing this action, [Rec. Doc. 42, at 7], Defendants' Memorandum does not discuss how Plaintiff failed to do so, and Defendants' Rule 56.1 statement does not allege any facts to dispute Plaintiff's allegations that he filed all three grievances in accordance with Directive 9.6. As such, the Court concludes that Defendants have not met their assigned burden "of proving failure to exhaust as an affirmative defense" at the summary judgment stage. *See Molina v. New York*, 697 F. Supp. 2d 276, 282 (N.D.N.Y. 2010). The Court will not grant summary judgment against Plaintiff on any of his claims on the ground of failure to exhaust to the extent that Defendants asserted this defense in their Motion for Summary Judgment.

while Plaintiff went through the motions at each level of the DOC's inmate grievance procedure pursuant to Directive 9.6.

As the statute of limitations period tolled from June 18, 2008, to, at a minimum, September 16, 2008, Plaintiff's initial Complaint would be timely as long as it was deemed filed by September 2, 2011. For the reasons set forth previously, the Court deems Plaintiff's initial Complaint filed on July 20, 2011. It is therefore clearly timely. The Defendants' Motion for Summary Judgment on the ground of statute of limitations is therefore denied as to all of Plaintiff's claims.

### C. PLAINTIFF'S RETALIATION/HARASSMENT CLAIMS

Plaintiff's first claim alleges that defendant Butkiewicus unlawfully retaliated against him "without justification and motivated by malice" in response to Plaintiff's "free speech exercise" by "ordering" his confinement to administrative segregation on June 4, 2008. Am. Compl. ¶ 20 [Rec. Doc. 30, at 5]. Defendants moved for summary judgment on Plaintiff's retaliation claim against defendant Butkiewicus, arguing that any actions Butkiewicus took against Plaintiff were "taken for a legitimate peniological [sic] reason" and that it "would have been irresponsible for defendant Butkiewicus to ignore" the conclusions regarding Plaintiff's actions that precipitated his transfer to segregation. Def. Mem. [Rec. Doc. 54-23, at 9-10].

To prevail on a retaliation claim, a plaintiff bears the burden of showing (1) that he "engaged in constitutionally protected conduct" and (2) that the "conduct was a substantial or motivating factor for the adverse actions taken by prison officials." *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003). If the plaintiff makes these preliminary showings, a defendant "may evade liability if [he] demonstrates that [he] would have disciplined or transferred him 'even in the absence of protected conduct.'" *Id.* (quoting *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir.

1996)).  Thus, an officer's action may be upheld, "if taken for both proper and improper

reasons[,] . . . if the action would have been taken based on the proper reasons alone." *Graham*,

89 F.3d at 79.  If the defendant "fails to prove that, absent that retaliatory animus, he would have

taken the same action," the plaintiff "must still demonstrate that the causal connection between

the defendant's action and the plaintiff's injury is sufficiently direct." *Gierlinger v. Gleason*, 160

F.3d 858, 872 (2d Cir. 1998).  Prisoners' claims of retaliation are to be examined "with

skepticism and particular care" because of "both the near inevitability of decisions and actions by

prison officials to which prisoners will take exception" and "the ease with which claims of

retaliation may be fabricated." *Colon*, 58 F.3d at 872 (citing *Flaherty v. Coughlin*, 713 F.2d 10,

13 (2d Cir. 1983)).  Accordingly, prisoners' retaliation claims must be "'supported by specific

and detailed factual allegations,'" and "not stated 'in wholly conclusory terms.'" *Friedl v. City of

N.Y.*, 210 F.3d 79, 86 (2d Cir. 2000) (quoting *Flaherty*, 713 F.2d at 13).

It is unclear from Plaintiff's filings what he alleges is the protected conduct that prompted

Butkiewicus's retaliation, *i.e.*, what specific act or acts Plaintiff took that he asserts constitute

constitutionally-protected "free speech exercise." *See* Am. Compl. ¶ 20 [Rec. Doc. 30, at 5].

Unlike well-settled protected speech such as "complaints, protests, and lawsuits," *see Beechwood

Restorative Care Ctr. v. Leeds*, 436 F.3d 147, 152 (2d Cir. 2006), the "free speech exercise"

Plaintiff relies on appears to be his own combative retorts and responses uttered during his

"heated debates" with Butkiewicus. *See, e.g.*, Dorlette Aff. ¶¶ 3-5 [Rec. Doc. 62-6, at 10-15].

Plaintiff cites no authority holding that these types of comments made during a heated debate

with correctional staff are "protected speech."[12]  Plaintiff's retaliation claim essentially alleges

---

[12] The Court notes that several district courts from the Second Circuit have found that abusive language
uttered by inmates during dialogue with prison guards does not constitute protected First Amendment speech. *See,
e.g., Jackson v. Onondaga County*, 549 F. Supp. 2d 204, 215 (N.D.N.Y. 2008) (Report and Recommendation of
Lowe, M.J., adopted by McAvoy, D.J.) ("I know of no case law that would support a conclusion that such [abusive]

that defendant Butkiewicus "ordered" his transfer to administrative segregation following a month-long series of verbal confrontations: after Plaintiff's May 6, 2008, transfer into Butkiewicus's close custody unit, Butkiewicus allegedly engaged in a pattern of behavior in which he repeatedly verbally threatened, accused, insulted, and harassed Plaintiff because of a "personal vendetta." Dorlette Aff. ¶¶ 2-3, 7 [Rec. Doc. 62-6, at 10-11, 13]. According to Plaintiff, the series of confrontations culminated in the June 4 meeting in which Butkiewicus "summoned" Plaintiff to his office, "demanded" that Plaintiff give him information related to the June 3 inmate assault, and then, after becoming upset at Plaintiff's "uncooperative" behavior, "indicated" that he would send Plaintiff to segregation "based on [his] slick mouth . . . and for snitching to the Warden." *Id.* ¶¶ 4-5 [Rec. Doc. 62-6, at 11-12] (internal quotation marks omitted). Plaintiff contends that Butkiewicus then "ordered" his transfer to segregation for "retaliatory punitive purposes" after Plaintiff refused to provide Butkiewicus with information. *Id.* ¶ 7 [Rec. Doc. 62-6, at 13].

Assuming, without deciding, that Plaintiff sufficiently articulated both a constitutionally protected activity and the requisite adverse action,[13] the Court will grant Defendants' Motion for Summary Judgment on Plaintiff's retaliation claim as it concludes, based on the record, that Plaintiff would have been disciplined and transferred in the absence of any alleged retaliatory animus on the part of Butkiewicus engendered by Plaintiff's claimed "free speech exercise." Defendants have "proffer[ed] an alternative basis for disciplining [Plaintiff] that would apply to

---

speech or conduct *against a prison guard* is protected by the First Amendment. Indeed, the instructive cases that I have found are quite to the contrary.") (footnote omitted) (italics in original).

[13] The Court assumes that the alleged "adverse action" is Plaintiff's transfer to administrative segregation, as courts addressing "claims of verbal threats and harassment advanced to support First Amendment retaliation claims have uniformly held that such conduct is not sufficiently serious" to constitute an "adverse action." *See, e.g.*, *Cabassa v. Smith*, 2009 WL 1212495, at *7 (N.D.N.Y. Apr. 30, 2009) (Report-Recommendation of Peebles, M.J., adopted by Kahn, D.J.) (citing cases).

him even if his version of events were true." *Graham*, 89 F.3d at 81. Specifically, Defendants assert that Plaintiff orchestrated the assault, constituted a threat to other inmates, and therefore should be placed in more restrictive housing. Butkiewicus Aff. ¶¶ 56-57 [Rec. Doc. 54-18, at 8]. Plaintiff's retaliation claim against Butkiewicus has entirely failed to account for the fact that numerous officers in addition to Butkiewicus participated in the investigation that determined Plaintiff orchestrated the June 3 inmate assault. *Id.* ¶ 44 [Rec. Doc. 54-18, at 7]; *see* Incident Report Package [Rec. Doc. 54-7]. Plaintiff does not allege that any other officer who participated in the investigation shared Butkiewicus's retaliatory animus, that Plaintiff had similar heated conversations with these officers, or that Butkiewicus improperly influenced the actions of any of these officers during the investigation. The extensive incident report package prepared as part of the investigation into the June 3 assault contained the reviews and conclusions of these additional officers, apart from those of Butkiewicus, who reached identical conclusions as to the ringleader behind the inmate assault. Butkiewicus Aff. ¶ 45 [Rec. Doc. 54-18, at 7]; *see* Incident Report Package [Rec. Doc. 54-7]. In response to Defendants' assertions that Plaintiff's segregation hearing was triggered in part by the conclusions in the incident report package, Plaintiff only conclusorily alleges that the accusations were "bogus" and speculates that Butkiewicus "coerced" informants into providing false information leading to those conclusions. Dorlette Aff. ¶¶ 5, 7 [Rec. Doc. 62-6, at 3, 13-15].

Plaintiff's claim, ostensibly labeled "retaliatory" because of Plaintiff's belief in Butkiewicus's "personal vendetta" against him, appears instead to be a thinly-disguised attack on the investigation that concluded he was complicit in—and in fact arranged—the June 3 inmate assault.[14] In challenging the methods used during the investigation, Plaintiff acknowledges that

---

[14] *See, e.g.*, Dorlette Aff. ¶ 7 [Rec. Doc. 62-6, at 14] ("Butkiewicus' account of his purported interview/encounters with the confidential informants are nonetheless . . . suspicious and extremely questionable.");

an independent, legitimate basis existed for transferring him to segregation that is entirely separate from Butkiewicus's allegedly retaliatory conduct taken in response to his "free speech exercise." Defendants have sufficiently demonstrated that Plaintiff's initial confinement to segregation prior to his formal July 3, 2008, hearing would have occurred regardless of any alleged retaliatory animus on the part of Butkiewicus, based on the wealth of data accumulated by all investigating officers regarding the identity of the person behind the June 3 assault. *See* Incident Report Package [Rec. Doc. 54-7]; *see, e.g.*, *Gonzalez v. Narcato*, 363 F. Supp. 2d 486, 497 (E.D.N.Y. 2005) (Report-Recommendation of Bloom, M.J., adopted by Gershon, D.J.) ("Moreover, even if plaintiff had established that his letter writing played a part in the decision, he cannot establish that he would not have been transferred but for his protected conduct. Defendants have established that plaintiff was transferred because he attempted to obtain information about a staff member at Arthur Kill and because of his disciplinary history."). Accordingly, the Court will grant Defendants' Motion for Summary Judgment on Plaintiff's retaliation claim against Butkiewicus.

To the extent that Plaintiff's Amended Complaint asserts a stand-alone claim for "harassment" separate and apart from his retaliation claim against Butkiewicus, *see* Am. Compl. ¶¶ 18-19 [Rec. Doc. 30, at 5]; *see also* Dorlette Aff. ¶ 4 [Rec. Doc. 62-6, at 2], the Court will grant summary judgment *sua sponte* on this claim because Plaintiff does not state a cognizable claim as a matter of law. *See Cabassa*, 2009 WL 1212495, at *7 (Report-Recommendation of

---

*id.* [Rec. Doc. 62-6, at 15] ("[I]t leads me to believe that defendant Butkiewicus was successful at recruiting an inmate to falsely inform on me for an 'incentive'"). Such speculative assertions are viewed with particular skepticism in light of the "ease with which claims of retaliation may be fabricated." *See Colon*, 58 F.3d at 872.

Peebles, M.J. adopted by Kahn, D.J.) ("[M]ere allegations of verbal abuse do not rise to the level

of a constitutional violation, and are not cognizable under 42 U.S.C. § 1983.") (citing cases).[15]

### D. PLAINTIFF'S DUE PROCESS CLAIMS RELATED TO HIS JULY 2008 ADMISSION INTO ADMINISTRATIVE SEGREGATION

In addition to alleging that his transfer to administrative segregation constituted unlawful

retaliation, Plaintiff also alleges that the procedure used to confine him to segregation and retain

him there violated his due process rights. Am. Compl. ¶¶ 22-50, 54 [Rec. Doc. 30, at 6-11].

Plaintiff alleges the process he received before, during, and after his July 3, 2008 hearing was

constitutionally deficient in seven separate ways: (1) that the notice he received prior to the

hearing was inadequate, insufficient, and vague, *id.* ¶¶ 28-33 [Rec. Doc. 30, at 7-8]; (2) that the

prison staff advocates assigned to assist him were inadequate in their preparation and advocacy

at his hearing, *id.* ¶¶ 34-35 [Rec. Doc. 30, at 8]; (3) that the hearing itself was unfair because he

was denied the opportunity for sufficient preparation, to call witnesses, or to examine the

evidence against him, *id.* ¶¶ 36-37 [Rec. Doc. 30, at 9]; (4) that he was provided inadequate,

insufficient, and vague notice as to the basis for his formal authorization for continued

---

[15] Defendants' Memorandum recognizes that Plaintiff "claims that he was subjected to retaliation *and harassment* by defendant Butkiewicus," Def. Mem. [Rec. Doc. 54-23, at 2] (emphasis added), but fails to address Plaintiff's "harassment" claim outside of including it under their statute of limitations defense, *see id.* at 7. Defendants did not move for summary judgment—or file a motion to dismiss earlier in the litigation—as to the harassment claim on the basis that the claim itself is not cognizable under 42 U.S.C. § 1983. Even in the absence of such an argument, the Court concludes that granting summary judgment *sua sponte* is appropriate under the circumstances, as this result is compelled by Defendants' oversight rather than Plaintiff's failure to come forward with all of his evidence in support of his claim. *See Garanti Finansal Kiralama A.S. v. Aqua Marine & Trading Inc.*, 697 F.3d 59, 64 (2d Cir. 2012) ("In granting summary judgment *sua sponte* . . . a district court must determine that the party against whom summary judgment is rendered has had a full and fair opportunity to meet the proposition that there is no genuine issue of material fact to be tried.") (quoting *Priestley v. Headminder, Inc.*, 647 F.3d 497, 504 (2d Cir. 2011)). The Plaintiff's verified Amended Complaint and Affidavit clearly outline the entirety of his factual allegations in support of his "harassment" claim. Such allegations, however, even if true, do not state a cognizable claim under prevailing jurisprudence. *See Cabassa*, 2009 WL 1212495, at *7. The Court therefore does not see the benefit of providing Plaintiff notice and an additional opportunity to marshal evidence in support of his claim, as additional evidence will not alter the Court's holding that the claim fails as a matter of law. The Court is convinced that the current "record . . . reflect[s] the losing party's inability to enhance the evidence supporting its position and the winning party's entitlement to judgment." *Garanti*, 697 F.3d at 64. Thus, the Court will exercise its discretion to grant summary judgment, even without additional notice to Plaintiff, on Plaintiff's harassment claim. *See id.* (quoting *Schwan-Stabilo Cosmetics GmbH & Co. v. Pacificlink Int'l Corp.*, 401 F.3d 28, 33 (2d Cir. 2005)).

segregation after his hearing, *id.* ¶¶ 42-43 [Rec. Doc. 30, at 10]; (5) that he was not notified of his "right to appeal" the transfer decision, *id.* ¶ 45; (6) that his appeal was improperly denied, *id.* ¶¶ 47-48 [Rec. Doc. 30, at 11]; and (7) that his status in administrative segregation was not reviewed periodically, *id.* ¶¶ 49-50.

Defendants contend that "a prisoner has no liberty interest in classification to administrative segregation," [Rec. Doc. 54-23, at 14], and alternatively, if Plaintiff did possess such a liberty interest, that he "received due process of law." Def. Mem. [Rec. Doc. 54-23, at 24]. Defendants also assert that the individual defendants are each entitled to qualified immunity for all of their actions taken during the course of Plaintiff's 2008 classification and transfer process that resulted in his confinement in administrative segregation. *Id.* at 45-46.

To present a valid due process claim, a plaintiff "must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004).

### 1. Existence of a Liberty Interest

As the Fourteenth Amendment's Due Process Clause "protects persons against deprivations of life, liberty, or property," a plaintiff asserting a due process violation must first "establish that one of these interests is at stake." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). Liberty interests "may arise from the Constitution itself" or they "may arise from an expectation or interest created by state laws or policies." *Id.* Although "the Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement," a "liberty interest in avoiding particular conditions of confinement may arise from state policies or regulations, subject to the important limitations set forth in *Sandin v. Conner*, 515 U.S. 472 [(1995)]." *Id.* In *Sandin*, the Supreme Court "abrogated the [previously used] methodology of

parsing the language of particular [state] regulations," *id.* at 222, holding that a prisoner's liberty

interests "will be generally limited to freedom from restraint which, while not exceeding the

sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of

its own force, . . . nonetheless imposes atypical and significant hardship on the inmate in relation

to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 483-84 (internal citations omitted).

As the Supreme Court observed in *Wilkinson*, *Sandin* made clear that the "touchstone of the

inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive

conditions of confinement is not the language of regulations regarding those conditions but the

nature of those conditions themselves 'in relation to the ordinary incidents of prison life.'"

*Wilkinson*, 545 U.S. at 223 (quoting *Sandin*, 515 U.S. at 484). Accordingly, "[a]s a result of

*Sandin*," the district court must conduct a "two-part analysis": a convicted prisoner "has a liberty

interest only if the deprivation . . . [(1)] is atypical and significant and [(2)] the state has created

the liberty interest by statute or regulation." *Tellier v. Fields*, 280 F.3d 69, 80 (2d Cir. 2000)

(quoting *Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997)).[16]

### a. Atypical and Significant Hardship

"Factors relevant to determining whether the plaintiff endured an 'atypical and significant

hardship' include 'the extent to which the conditions of the disciplinary segregation differ from

other routine prison conditions' and 'the duration of the disciplinary segregation imposed

compared to discretionary confinement.'" *Davis v. Barrett*, 576 F.3d 129, 133 (2d Cir. 2009)

(quoting *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004)). The Second Circuit has

---

[16] As subsequent cases have recognized, the standard set out in *Sandin* applies to convicted prisoners and "not the rights of pretrial detainees" who have not yet been convicted of any crime. *See, e.g.*, *Adams v. Galleta*, 1999 WL 959368, at *5 (S.D.N.Y. Oct. 19, 1999) (citing cases). The test for a pre-trial detainee's liberty interest follows a different framework than that set out in *Sandin*, as discussed *infra* in note 38 in relation to Plaintiff's 2009 due process claims.

previously "emphasized that the duration of [administrative segregation] confinement is a distinct factor bearing on atypicality and must be carefully considered." *Colon v. Howard*, 215 F.3d 227, 231 (2d Cir. 2000) (citing *Sealey v. Giltner*, 197 F.3d 578, 586 (2d Cir. 1999)).  In *Howard*, the Second Circuit held that "[c]onfinement in normal [administrative segregation] conditions for 305 days is in our judgment a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin*." *Id.* ("There are no precise calipers to measure the severity of [segregation] hardship, but we believe that wherever the durational line is ultimately drawn, 305 days [of confinement] satisfies the standard."); *see also Palmer*, 364 F.3d at 65 (affirming the holding in *Colon*).

In determining the duration of an inmate's confinement, the Second Circuit has held that separate sentences in segregation "'should be aggregated for purposes of the *Sandin* inquiry' when they constitute a sustained period of confinement." *Giano v. Selsky*, 238 F.3d 223, 226 (2d Cir. 2001) (quoting *Sims v. Artuz*, 230 F.3d 14, 23-24 (2d Cir. 2000)).  In *Giano*, the circuit court found aggregation "particularly appropriate" where it was "clear" that the plaintiff's segregation at a second prison facility was "simply a continuation of his segregation" at the first facility. *Id.* The circuit court further justified its decision to aggregate because the record indicated "that the two periods of confinement were based on the same administrative rationale" and that "the conditions of [the plaintiff's] confinement were, for all practical purposes, identical" at the two separate facilities. *Id.*  Therefore, the *Giano* Court ultimately determined that under those circumstances, the plaintiff's "two sentences of administrative segregation must be considered cumulatively for purposes of the *Sandin* analysis." *Id.*

Defendants do not dispute that Plaintiff was, as he alleges, "confined to segregation for over 305 days." Am. Compl. ¶ 49 [Rec. Doc. 30, at 11].  Viewing the facts in the light most

favorable to Plaintiff, he spent a minimum of 369 days in administrative segregation: he was initially transferred to administrative segregation on June 4, 2008, and this initial period of confinement ended upon his release from DOC custody on December 5, 2008. Dorlette Aff. ¶ 34 [Rec. Doc. 62-8, at 9]. He was readmitted to administrative segregation at NCI on December 30, 2008, and completed the program at the "end of July early August 2009." *Id.* ¶ 20 [Rec. Doc. 62-8, at 3].[17] Using the dates of Plaintiff's formal authorizations for transfer to administrative segregation—July 8, 2008, and January 26, 2009, respectively—Plaintiff's confinement in segregation was 307 days,[18] two days longer than the duration the Second Circuit in *Colon* held was "atypical and significant." Defendants also do not contest that "the two periods of confinement were based on the same administrative rationale"; indeed, the Notification of Hearing Forms used to inform Plaintiff of the reasons for both his July 3, 2008, and January 15, 2009, hearings stated that those hearings were to determine whether his presence in general population presented a threat to the safety and security of the institution. *See* 2008 Hearing Package [Rec. Doc. 54-8, at 2]; 2009 Hearing Package [Rec. Doc. 54-9, at 2].

Defendants' Memorandum contends generally that "a prisoner has no liberty interest in classification to administrative segregation." Def. Mem. [Rec. Doc. 54-23, at 14]. Defendants do not address the post-*Sandin* Supreme Court and Second Circuit case law that made clear that the "touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is . . . the nature of those conditions themselves

---

[17] As Plaintiff could not identify a specific date in July or August 2009 that he was released from administrative segregation, the Court chose July 1, 2009, as the cut-off date for Plaintiff's second period of confinement.

[18] The Court again chose July 1, 2009, as the cut-off date for Plaintiff's second period of confinement.

'in relation to the ordinary incidents of prison life.'" *Wilkinson*, 545 U.S. at 223.[19]  Nor do they

address specifically the duration of Plaintiff's segregation or the case law on aggregation of

confinement periods.  Rather, Defendants focus almost exclusively on the methodology

"abrogated [by *Sandin*]," *see Wilkinson*, 545 U.S. at 222, "of parsing the language of particular

[state] regulations." *See* Def. Mem. [Rec. Doc. 54-23, at 17-19, 22-23].  The Court therefore

concludes that Plaintiff's confinement for more than 305 days in administrative segregation at

NCI—regardless of whether his conditions were "normal" or "different" from routine

conditions—meets the *Sandin* standard. *See Colon*, 215 F.3d at 231-32.

### b.  State Statute or Regulation

The second prong of the liberty interest analysis requires the Court to examine whether

Connecticut has created a liberty interest by statute or regulation. *See Tellier*, 280 F.3d at 80.

The Court finds that Connecticut has created a protectable liberty interest.

"A state-created liberty interest 'arises when state statutes or regulations require, in

language of an unmistakably mandatory character, that a prisoner not suffer a particular

deprivation absent specified predicates." *Vega v. Lantz*, 596 F.3d 77, 83 (2d Cir. 2010) (quoting

*Welch v. Bartlett*, 196 F.3d 389, 392-93 (2d Cir. 1999)).  The Supreme Court has held that the

"repeated use of explicitly mandatory language in connection with requiring specific substantive

predicates demands a conclusion that the State has created a protected liberty interest." *Adams*,

---

[19] As the confinement period was longer than 305 days, the Court does not need to evaluate the conditions themselves, as *Colon* held that confinement of this length of time in even "normal" segregation conditions met the *Sandin* standard. *See Colon*, 215 F.3d at 231.  Nevertheless, Plaintiff has contended that his confinements in administrative segregation "subjected him to an atypical and significant hardship in relation to the ordinary incidents of prison life," Pl. Opp'n Mem. [Rec. Doc. 62-4, at 34], citing to numerous specific conditions outlined in both his Amended Complaint, *see* Am. Compl. ¶ 52 [Rec. Doc. 30, at 12], and Affidavit, *see* Dorlette Aff. ¶ 16 [Rec. Doc. 62-7, at 7-10] that he maintains caused him atypical and significant hardship. Defendants' only discussion of the conditions of confinement of the administrative segregation program was in relation to Plaintiff's stand-alone claim that those conditions constituted cruel and unusual punishment. *See* Def. Mem. [Rec. Doc. 54-23, at 36-45]. Defendants did not address Plaintiff's argument that the conditions of his confinement caused him atypical and significant hardship so as to implicate a liberty interest under *Sandin*.

1999 WL 959368, at *5 (quoting *Hewitt v. Helms*, 459 U.S. 460, 472 (1983)); *see also Oliphant v. Wezner*, 2005 WL 999973, at *6 (D. Conn. Apr. 27, 2005) ("[A] state may create a protectable liberty interest where . . . the state enacts statutes or promulgates prison regulations that entitle prisoners to certain procedural protections.") (citing *Wolff v. McDonnell*, 418 U.S. 539, 557-58 (1974)).

The relevant Connecticut directive[20] governing inmates' placement into administrative segregation uses unmistakably mandatory language and details specified predicates to the inmates' placement into that program. Administrative Directive 9.4 provides that "[p]lacement of an inmate on Administrative Segregation shall be at the discretion of the Director of Offender Classification and Population Management but in accordance with the process outlined in this Directive. An inmate *shall not be placed* in Administrative Segregation Phase I . . . *without notice and a hearing*." Admin Dir. § 12 [Rec. Doc. 54-11, at 8] (emphasis added). Although the Directive states that the Director has the "discretion" to initially place an inmate in administrative segregation, the language used by the Directive explicitly requires the inmate to have a notice and a hearing *before* the Director ultimately exercises his or her discretion in making this placement. The use of "shall" in § 12 is mandatory, not discretionary. *See Russell v. Coughlin*, 910 F.2d 75, 77 (2d Cir. 1990) ("To create a constitutionally protected liberty interest, a state regulation must employ 'language of an unmistakably mandatory character, requiring that certain procedures 'shall,' 'will,' or 'must' be employed."). The notice and hearing represent specified substantive predicate actions that must be taken prior to the placement. *See McCarthy*

---

[20] "Pursuant to [the authority conferred to the state's Commissioner of Corrections under Conn. Gen. Stat. § 18-81], the [C]ommissioner has promulgated a set of directives, which are written guidelines pertaining to several correctional facilities. . . . [They] are utilized to establish the parameters for the operation of the facilities. These directives set forth procedures for dealing with inmates, define inmate classifications and are used as guidelines to adhere to the department's mission to maintain secure, safe and humane correctional facilities." *Beasley v. Comm'r of Corr.*, 718 A.2d 487, 490 (Conn. App. Ct. 1998), *aff'd*, 733 A.2d 833 (Conn. 1999).

*v. Armstrong*, 2 F. Supp. 2d 231, 233 (D. Conn. 1998) ("Administrative Directive 9.4 provides for a hearing *before* an inmate is confined in administrative segregation.") (emphasis added). Thus, the Court concludes that Directive 9.4 clearly uses "language of an unmistakably mandatory character, that a prisoner not suffer a particular deprivation absent specified predicates." *See Vega*, 596 F.3d at 83. The Court therefore agrees with the district court in *Alston v. Cahill*, 2012 WL 3288923 (D. Conn. Aug. 10, 2012), the case relied on by Plaintiff, that Connecticut prisoners "have a state-created liberty interest in avoiding administrative segregation based on a finding that they pose a danger." 2012 WL 3288923, at *5. The Court notes here that Defendants' Memorandum entirely fails to address the applicability of Directive 9.4 as the source of a state-created liberty interest.

Although several Connecticut courts at the federal and state levels have found that the state's pre-trial detainees and incarcerated inmates have no protected liberty interest in their classification generally because the relevant Connecticut statute[21] and regulation[22] allow for the exercise of "discretion," the Court again agrees with the rationale of the district court in *Alston* that the Director's use of discretion is "cabin[ed] . . . by requiring the director to act in accordance with the substantive requirements of Administrative Directive 9.4." *Id.*; *see also Oliphant*, 2005 WL 999973, at *6 n.1 ("[T]he procedural guarantees set forth in the Administrative Directives demonstrate that the Commissioner has chosen to circumscribe her discretion by guaranteeing certain procedural protections."). Moreover, these cases do not refer

---

[21] *See* Conn. Gen. Stat. § 18-81 ("The [C]ommissioner [of Correction] shall be responsible for establishing . . . classification . . . services and programs throughout the department.").

[22] *See* Admin. Dir. 9.4, § 12 [Rec. Doc. 54-11, at 8] ("Placement of an inmate on Administrative Segregation *shall be at the discretion* of the Director of Offender Classification and Population Management in accordance with this Directive.") (emphasis added). The cases that specifically cited Directive 9.4 did not, however, address the sentence in that Directive that immediately follows the reference to "discretion," *see id.* ("An inmate *shall not be placed* in Administrative Segregation Phase I . . . without notice and a hearing.").

to, or analyze the implications of, the specific mandatory language of § 12 quoted above, which uses explicit, mandatory language in requiring notice and a hearing prior to placement into administrative segregation.[23]  The Court therefore finds the holding of these cases—that Connecticut prisoners have no protected liberty interest in their general "classification" because the Commissioner of Corrections or the Director of Classification ultimately possesses "discretion" to place an individual into administrative segregation—cannot control the outcome of Plaintiff's claims here, as these cases fail to discuss the most important provisions of the pertinent state regulation for purposes of analyzing whether Plaintiff possessed a state-created liberty interest.

---

[23] *See Hamer v. Arnone*, 2011 WL 2680836, at *3 (D. Conn. July 7, 2011) (concluding that Connecticut prisoners "do not have a protected liberty interest in their classifications because the Commissioner of Correction has discretion to classify prisoners" without addressing the mandatory language of Directive 9.4); *Torres v. Howell*, 2006 WL 1525942, at *16 (D. Conn. May 30, 2006) (concluding, without addressing Directive 9.4, that "[i]n Connecticut, an inmate has no protected right to a particular classification level" because Conn. Gen. Stat. § 18-81 gives the Commission of Correction "discretionary authority" to classify prisoners); *Harris v. Meulemans*, 389 F. Supp. 2d 438, 441-42 (D. Conn. 2005) (holding that "[u]nder Connecticut law, [specifically, § 18-81], the Commissioner of Correction retains discretionary authority to classify prisoners at any security level" while analyzing the language of Directives 6.4 ("Security Risk Groups") and 9.2 ("Inmate Classification")); *Torres v. Stewart*, 263 F. Supp. 2d 463, 469-70 (D. Conn. 2003) (concluding that "Connecticut inmates have no state or federally created liberty interest in their classification" while analyzing Directive 6.14(3)(E) on classification as a security risk group safety threat member); *Vandever v. Comm'r of Corr.*, 42 A.3d 494, 497-98 (Conn. App. Ct. 2012) (concluding, without addressing Directive 9.4, that the plaintiff failed to show a deprivation of a constitutional right by his having been placed in administrative segregation, as it was a "decision within the [Commissioner's] discretion [under § 18-81] to classify the [plaintiff] at the administrative segregation level"); *Wheway v. Warden*, 576 A.2d 494, 501 (Conn. 1990) (concluding that "[b]ecause the prison authorities have *full discretion* to grant or deny the *early release programs*," the plaintiff did not have a statutory entitlement sufficient to invoke due process considerations, without addressing Directive 9.4 or administrative segregation) (emphasis added); *see also Green v. Armstrong*, 189 F.3d 460, 1999 WL 642910, at *2 (2d Cir. Aug. 20, 1999) (summary order) (citing *Wheway* for the proposition that Connecticut law does not create a liberty interest in prisoner classifications in a sex offender classification challenge); *Vega v. Lantz*, 2007 WL 3025285, at *2 (D. Conn. Oct. 16, 2007) (citing *Green, Harris*, and *Wheway* for the proposition that "classification of inmates by the Connecticut DOC does not give rise to a due process right of action"); *Taylor v. Levesque*, 2005 WL 3050973, at *3-4 (D. Conn. Nov. 10, 2005) (citing *Green, Harris*, and *Wheway* for this same proposition), *aff'd*, 246 F. App'x 772 (2d Cir. 2007); *cf. Pugliese v. Nelson*, 617 F. 2d 916, 923-24 (2d Cir. 1980) (concluding that *federal* prisoners have no liberty interest in their classification because under the relevant *federal* statutes, 18 U.S.C. §§ 4081-82, "the Attorney General *has complete and absolute discretion* with respect to the incarceration, classification and segregation of lawfully convicted prisoners" and the relevant Bureau of Prisons Policy Statement "*does not limit in any way* the Attorney General's discretion" to grant or deny transfers or work releases) (emphasis added).

Accordingly, Defendants' Motion for Summary Judgment on the basis that Plaintiff lacked a protected liberty interest in his classification and transfer to administrative segregation is denied.

### 2. Application of the Qualified Immunity Defense

The Court need not evaluate whether Plaintiff was deprived of his liberty interest as a result of insufficient process, *see Ortiz*, 380 F.3d at 654, as it will grant Defendants' Motion for Summary Judgment against Plaintiff on all of his due process claims related to his 2008 transfer to administrative segregation on the basis of qualified immunity. "Qualified immunity shields government officials performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Zellner v. Summerlin*, 494 F.3d 344, 367 (2d Cir. 2007) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The "relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a *reasonable officer* that his conduct was unlawful in the situation he confronted." *Zalaski v. City of Hartford*, --- F.3d ----, 2013 WL 3796448, at *4 (2d Cir. July 23, 2013) (emphasis in original) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).[24] "If the illegality of the conduct would not be so apparent, the officer is entitled to qualified immunity." *Id.* Indeed, the Supreme Court has "expressly cautioned against framing the constitutional right [at issue] at too broad a level of generality." *Redd v. Wright*, 597 F.3d 532, 536 (2d Cir. 2010) (citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999)). Therefore, to be "clearly established," the "contours of the right [must be] sufficiently clear [so] that a reasonable official would understand that what he is doing violates

---

[24] In *Pearson v. Callahan*, 555 U.S. 223 (2009), the Supreme Court held that district courts have discretion to address the question of whether a right was "clearly established" before addressing the question of whether the officer's conduct actually violated any of the plaintiff's constitutional rights. *See Zalaski*, 2013 WL 3796448, at *4.

that right." *Gonzalez v. City of Schenectady*, --- F.3d ----, 2013 WL 4528864, at *9 (2d Cir. Aug. 28, 2013) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  In conducting this analysis, the court is to consider "(1) whether the right in question was defined with reasonable specificity; (2) whether Supreme Court or court of appeals case law supports the existence of the right in question, and (3) whether under preexisting law a reasonable defendant would have understood that his or her acts were unlawful." *McGarry v. Pallito*, 687 F.3d 505, 512 (2d Cir. 2012) (quoting *Scott v. Fischer*, 616 F.3d 100, 105 (2d Cir. 2010)).

"[E]ven if a right is clearly established in certain respects, qualified immunity will still shield an officer from liability if 'officers of reasonable competence could disagree' on the legality of the action at issue in its particular factual context." *Zalaski*, 2013 WL 3796448, at *4 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  In other words, if "at least some reasonable [officials] in the defendant's position 'could have believed that [the challenged conduct] was within the bounds of appropriate . . . responses,' the defendant [official] is entitled to qualified immunity." *Id.* (quoting *Saucier*, 533 U.S. at 208).  This standard provides a "broad shield" to liability that gives "ample protection to all but the plainly incompetent or those who knowingly violate the law." *Id.* at *5 (quoting *Malley*, 475 U.S. at 341).

Defendants contend that they are "entitled to qualified immunity" on all of Plaintiff's claims because "at all times they believed that their actions were lawful and were for the purpose of restoring and maintaining control and order while ensuring the safety and security of the plaintiff, staff and the facility." Def. Mem. [Rec. Doc. 54-23, at 45-46].  Therefore, they assert that all of the individual defendants' actions were "objectively reasonable." *Id.*[25]  Plaintiff

---

[25] Defendants' Memorandum did not specifically address whether any specific constitutional rights— including any federal due process rights due to inmates prior to their classification and transfer—were "clearly established" at the time of any individual defendant's act or failure to act.

challenges the applicability of the qualified immunity defense by arguing that the "contours of [his] rights," several of which he cites specifically, "were sufficiently clear for a reasonable person to have understood them." *See* Pl. Opp'n Mem. [Rec. Doc. 62-5, at 9-10]. However, Plaintiff does not cite any authority from Connecticut, the Second Circuit, or the Supreme Court, beyond the 2012 *Alston* decision, that substantiate this assertion as to any specific federal due process right or rights.

The Court's analysis of the existence of Plaintiff's state-created liberty interest in the preceding section of this Ruling makes clear that Plaintiff's entitlement to federal due process rights prior to his classification and transfer to administrative segregation was not "clearly established" as of July 2008 and that reasonable officers could have disagreed as to Plaintiffs' entitlement to such rights. Every case from state and federal courts in Connecticut decided prior to July 2008, to which Connecticut prison officials, such as Defendants, may have referred to determine the legality of their actions during classification and transfer procedures for inmates, held that Connecticut inmates did not possess a protected liberty interest in their classification. *See* cases cited *supra* note 23.[26] In addition, the most pertinent Second Circuit[27] and Supreme

---

[26] The only state or federal court in Connecticut to hold that Directive 9.4 creates a liberty interest issued its opinion some four years *after* Plaintiff's admission to administrative segregation in 2008. *See Alston*, 2012 WL 3288923, at *4 (Chatigny, J.). In addition to citing numerous cases holding that Connecticut inmates did not possess a liberty interest in their classification, the court in *Alston* also conceded that at the time of its 2012 decision, the Second Circuit still had not yet addressed the question of whether *Connecticut* inmates possessed such an interest. *See id.* ("The Second Circuit has not addressed whether Connecticut's regulations are sufficiently similar to New York's to establish a protected liberty interest. I conclude that they are."). The Court notes that the only other opinion that found that the Commissioner of Connecticut's discretion to classify prisoners is restricted by Directive 9.4, thereby creating a liberty interest, was *Furtick v. Arnone*, 2012 WL 5182959 (D. Conn. Oct. 18, 2012), in which Judge Chatigny cited his opinion in *Alston*. As noted on page 28, this Court agrees with the rationale and result in *Alston*.

[27] *See, e.g., Taylor v. Levesque*, 246 F. App'x 772, 774 (2d Cir. 2007) (summary order) ("Moreover, Connecticut has not granted inmates, by regulation or statute, a protected interest in their security classification; the matter is committed to the discretion of the Commissioner of Corrections."); *Green v. Armstrong*, 189 F.3d 460, 1999 WL 642910 (2d Cir. 1999) (summary order) ("Accordingly, Green cannot state a due process claim based on the change in his prison classification."); *see also Covino*, 933 F.2d at 129 ("We agree with the general proposition that 'the transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons' is not a right

Court[28] decisions to which prison officials may have referred for guidance on the status of federal due process rights for Connecticut inmates point to the *lack* of a constitutionally- or state-created liberty interest in classification and transfer for administrative purposes.[29] In addition, based on the state of the case law in Connecticut in 2008, the Court does not find that the due process rights available to Connecticut inmates during their classification and transfer were defined with "reasonable specificity," as it was not clear that an inmate was entitled to any federal due process rights at all. The Court concludes that Plaintiff's possession of a liberty

---

protected by the due process clause itself."); *Pugliese*, 617 F.2d 923 (concluding "that a prisoner's interest in avoiding CMC classification does not entitle him to due process protections").

 The Second Circuit in *Taylor v. Rodriguez*, 238 F.3d 188 (2d Cir. 2001), discussed the sufficiency of the process given to a Connecticut inmate "assuming the existence of a liberty interest." 238 F.3d at 192. The circuit court's discussion of the process due to the inmate, however, was contingent on the district court's determination on remand of whether the plaintiff had "shown a protected liberty interest" by analyzing whether "the state [of Connecticut] has granted its inmates, by regulation or by statute, a protected liberty interest in remaining free from that confinement." *Id.* at 196. The circuit court in *Taylor* made clear that no such liberty interest had yet been found. *Id.* Moreover, the circuit court instructed the district court on remand that it may consider the "arguments raised by defendants regarding . . . qualified immunity," as the district court had not considered those arguments in its initial ruling. *Id.* at 197. Finally, the hearing the plaintiff-inmate in *Taylor* alleged was constitutionally deficient was conducted "to determine whether he was a member of a security risk group that constituted an institutional safety threat" pursuant to Directives 6.14 and 9.5; it was not a hearing conducted pursuant to Directive 9.4 to determine whether to confine the plaintiff to administrative segregation. *Id.* at 190, 192. Based upon these limitations, the Court does not believe *Taylor* "clearly established" the existence of Connecticut inmates' liberty interest—or the due process rights for those inmates—in avoiding classification and transfer to administrative segregation.

 [28] *See, e.g.*, *Wilkinson*, 545 U.S. at 221 ("[T]he Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement."); *Hewitt*, 459 U.S. at 469-71 (concluding that the Due Process Clause itself did not create a liberty interest in avoiding administrative segregation but that "in the light of the *Pennsylvania statutes and regulations here in question*, . . . [the prisoner] did acquire a protected liberty interest in remaining in the general prison population") (emphasis added); *Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976) (holding the prisoner had "no legitimate statutory or constitutional entitlement sufficient to invoke due process" in his "classification and eligibility for rehabilitative programs in the federal system").

 [29] Although not a dispositive factor in the analysis on this prong of qualified immunity, the Second Circuit has held that in "deciding whether a right was clearly established," the court is to determine whether the "Supreme Court or the Second Circuit affirmed" the existence of the right. *See Gonzalez*, 2013 WL 4528864, at *9. *See also Moore v. Vega*, 371 F.3d 110, 114 (2d Cir. 2004) ("Only Supreme Court and Second Circuit precedent existing at the time of the alleged violation is relevant in deciding whether a right is clearly established."). No such Supreme Court or Second Circuit authority exists here as related to Connecticut inmates.

interest, triggering his entitlement to federal due process rights, was not "clearly established" in July 2008.[30]

Moreover, the Court finds that Connecticut prison officials of reasonable competence could have disagreed as to the exact nature of the procedures required by federal due process for Connecticut inmates. Based on the numerous cases cited previously, the Court finds that at least some reasonable officers in the Defendants' positions could have believed that Connecticut inmates were entitled to no federal due process protections at all in their classification and transfer to administrative segregation. At a minimum, the officials could have disagreed as to the specific requisite actions sufficient to guarantee that an inmate received due process meeting federal constitutional standards. Thus, the Court concludes that it was objectively reasonable for the individual defendants to believe that Plaintiff did not possess a liberty interest and therefore was not entitled to federal due process rights in his classification and transfer to administrative segregation.

Accordingly, all of the individual defendants are entitled to qualified immunity on Plaintiff's seven federal due process claims related to his July 2008 transfer to administrative segregation on both applicable prongs of the analysis.[31] *See McGarry*, 687 F.3d at 512

---

[30] Thus, the situation facing New York prison officials in July 2008—when clearly-settled law held New York inmates possessed a liberty interest in their classification and transfer—can be easily distinguished. In 1999, the Second Circuit held that New York's regulations established mandatory predicates for administrative segregation and that New York therefore created a liberty interest in freedom from administrative segregation. *See Sealey*, 197 F.3d at 584-85. In *Sealey*, however, the circuit court specifically cited the applicable New York regulations that established these mandatory predicates. *See id.*

[31] The Court notes that the question of whether any individual defendants complied with the specific procedures set out in the DOC's Administrative Directives is irrelevant to Plaintiff's federal due process claims, as state regulations do not "settle what protection the federal due process clause requires." *Russell*, 910 F.2d at 78 n.1; *see A'Gard v. Perez*, --- F. Supp. 2d ----, 2013 WL 298377, at *5 (S.D.N.Y. Jan. 26, 2013) ("Whether prison regulations—such as a specific form of notice—were followed precisely is not a basis to conclude that any constitutional rights have been violated. . . . Any alleged violations of prison directives or regulations do not give rise to a federal claim, because '[f]ederal constitutional standards rather than state law define the requirements of procedural due process.'") (quoting *Russell*, 910 F.2d at 78 n.1).

("Defendants are entitled to qualified immunity 'if either (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law.'") (quoting *Anderson v. Recore*, 317 F.3d 194, 197 (2d Cir. 2003)). The Court will therefore grant Defendants' Motion for Summary Judgment against Plaintiff on all seven of his due process claims related to his July 2008 transfer to administrative segregation and dismiss those claims against all individual defendants.

### E. PLAINTIFF'S § 1983 CONSPIRACY CLAIM

Plaintiff brings a § 1983 conspiracy claim against defendants Butkiewicus and McGill, alleging that they "came together into a conspiracy to violate [his] constitutional rights and cause him harm and to punish [him]." Am. Compl. ¶ 56 [Rec. Doc. 30, at 13]. Defendants' Memorandum never specifically addresses the validity of Plaintiff's conspiracy claim.[32] The only bases for summary judgment asserted by Defendants that the Court could plausibly construe as applicable to Plaintiff's conspiracy claim are the statute of limitations defense, the personal involvement defense, and the qualified immunity defense. The Court will nonetheless grant summary judgment against Plaintiff *sua sponte* on his conspiracy claim and dismiss that claim against Butkiewicus and McGill as the Court has dismissed all of the underlying § 1983 claims upon which the conspiracy claim is based. *See Garcia v. Hebert*, 2013 WL 1294412, at *13 (D. Conn. Mar. 28, 2013) ("Because the defendants are entitled to summary judgment on all underlying substantive claims, the civil conspiracy claims fail as a matter of law."); *DeStefano v. Duncanson*, 2011 WL 651452, at *4 (S.D.N.Y. Feb. 10, 2011) ("Plaintiff's conspiracy claim is based on his malicious prosecution claim. . . . Having dismissed Plaintiff's § 1983 substantive claim, his related conspiracy claim must also be dismissed."); *Hardy v. Fischer*, 701 F. Supp. 2d

---

[32] The "Introduction" section to Defendants' Memorandum, which lists the claims asserted by Plaintiff, does not include conspiracy as one of the claims Defendants recognized Plaintiff alleged in his Amended Complaint. *See* Def. Mem. [Rec. Doc. 54-23, at 2].

605, 610 n.4 (S.D.N.Y. 2010) ("Each plaintiff also alleges that defendants conspired to violate

§ 1983 by depriving them of these same due process rights. Because the Court finds that

defendants are all entitled to qualified immunity or another privilege that overcomes the

individual § 1983 claims, the claims for conspiracy also fail."); *see also Singer v. Fulton County

Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995) (holding that a § 1983 claim "will stand only insofar as

the plaintiff can prove the *sine qua non* of a § 1983 action: the violation of a federal right").[33]

### F. PLAINTIFF'S CONDITIONS OF CONFINEMENT CLAIMS RELATED TO HIS INITIAL PLACEMENT IN ADMINISTRATIVE SEGREGATION

Plaintiff alleges that "[a]s a result of [his] unlawful transfer to and retention in

segregation, he was subjected to cruel and unusual conditions of confinement." Am. Compl. ¶ 51

[Rec. Doc. 30, at 11]. "In its prohibition of 'cruel and unusual punishments,' the Eighth

Amendment places restraints on prison officials" and also "imposes duties on these officials,

who must provide humane conditions of confinement." *Farmer v. Brennan*, 511 U.S. 825, 832

(1994). Accordingly, the "conditions of a prisoner's confinement can give rise to an Eighth

Amendment violation." *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (citing *Farmer*,

511 U.S. at 828). In challenging his conditions of confinement as an Eighth Amendment

violation, a prisoner may "prevail only where he proves both an objective element—that the

prison officials' transgression was 'sufficiently serious'—and a subjective element—that the

officials acted, or omitted to act, with a 'sufficiently culpable state of mind,' *i.e.,* with 'deliberate

indifference to inmate health or safety.'" *Id.* (quoting *Farmer*, 511 U.S. at 834). "Concerning the

---

[33] The Court does not find that notice to Plaintiff prior to granting summary judgment *sua sponte* is necessary as Plaintiff already had the opportunity to marshal evidence in support of this claim. Plaintiff's verified Amended Complaint and Affidavit detail his allegations of a conspiracy between Butkiewicus and McGill. The claim ultimately fails not because Plaintiff did not have the opportunity to come forward with all of his evidence, but because the conspiracy claim cannot be made out as a matter of law if all underlying § 1983 claims have been dismissed. *See Hardy*, 701 F. Supp. 2d at 610 n.4. Therefore, granting Plaintiff an additional opportunity to enhance the evidence supporting his position on the conspiracy claim would not alter the outcome. The Court therefore will grant summary judgment *sua sponte* without notice to Plaintiff.

'subjective' requirement, . . . 'a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Id.* (quoting *Farmer*, 511 U.S. at 837). Thus, it is "not enough that the prison official should have known of the risk to the prisoner; he or she must have been actually aware of it." *Bell v. Luna*, 856 F. Supp. 2d 388, 399 (D. Conn. 2012) (citing *Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009)).

Plaintiff's claim under the Eighth Amendment alleges that he endured the following "cruel and unusual" conditions while in administrative segregation: (1) lack of adequate ventilation; (2) lack of adequate recreation; (3) "extreme noise levels" from others' kicking and banging; (4) excessive use of mechanical restraints; (5) lack of adequate mental health treatment; (6) pairing with "severely mentally ill prisoners who constantly create an extremely unsanitary and disruptive environment" by "smearing (in cells) and tossing fecal matters and other human waste"; and (7) sleep deprivation. Am. Compl. ¶ 52 [Rec. Doc. 30, at 12].[34]  Plaintiff claims that he was "subjected" to these cruel and unusual conditions "by all of the previously named defendants who entered into a conspiracy agreement to punish [him], unlawfully that is." *Id.* ¶ 53.  While Plaintiff's reference to "all of the previously named defendants" is somewhat ambiguous, construing the Amended Complaint liberally, *see Triestman*, 470 F.3d at 474-75, the Court finds Plaintiff has alleged his conditions of confinement claim against the following

---

[34] In his Affidavit submitted in support of his Opposition Memorandum, Plaintiff alleged some fifteen additional conditions that he contended were cruel and unusual. Dorlette Aff. ¶ 16 [Rec. Doc. 62-7, at 7-10].  These additional conditions were not included in his Amended Complaint.  The Court does not consider any of the allegedly unconstitutional conditions of confinement not specifically enumerated in the Amended Complaint, as it is "inappropriate to consider claims not pleaded in the complaint in opposition to summary judgment." *Scott v. City of N.Y. Dep't of Corr.*, 641 F. Supp. 2d 211, 229 (S.D.N.Y. 2009) (collecting cases), *aff'd*, 445 F. App'x 389 (2d Cir. 2011).

individual defendants named in the Amended Complaint: Butkiewicus, McGill, Guertin, Frasco, Tourangeau, Levesque, Clapp, Mangiafico, Marcial, Salius, Bradway, Lantz, Murphy, and Light. *See* Am. Compl. ¶¶ 7-16 [Rec. Doc. 30, at 2-4]. Plaintiff's Amended Complaint also alleges a separate "deliberate indifference/supervisory liability claim" stemming from his conditions of confinement claim against defendants Butkiewicus, McGill, Levesque, Clapp, Marcial, Salius, Bradway, Lantz, Murphy, and Light. *Id.* ¶¶ 54-55 [Rec. Doc. 30, at 12-13]. This second group of supervisory defendants, Plaintiff alleges, "knew/or should have known through reports, letters, complaints and by other means that [he] was unlawfully transferred and retained in extremely harsh conditions," and that they "chose intentionally to disregard/or to turn a blind eye to the harsh conditions and correct the violations, allowing [him] to suffer further." *Id.* ¶ 55 [Rec. Doc. 30, at 13].

Defendants moved for summary judgment on Plaintiff's conditions of confinement claims on both the subjective and objective prongs of the analysis. They contend first that Plaintiff "offered only conclusory allegations" and that Plaintiff "offered no specific facts under which he could state a violation of the Eighth Amendment" against any defendant. Def. Mem. [Rec. Doc. 54-23, at 36]. Defendants next challenged that any of the alleged conditions met the objective element of the test, *i.e.*, that any of the alleged conditions were sufficiently serious so as to violate contemporary standards of decency. *Id.* at 38-45.

To the extent that Plaintiff alleges stand-alone conditions of confinement claims against all of the individual defendants, the Court will grant Defendants' Motion for Summary Judgment against Plaintiff on these claims. Plaintiff has not alleged any facts indicating that any of the individual defendants actually created the conditions or subjected Plaintiff to them, other than a conclusory allegation that they did so by entering into "a conspiracy agreement to punish" him.

Plaintiff has not alleged specific conduct by any individual defendant showing that that defendant's actions produced, created, or implemented the conditions of which he complains. Plaintiff has also not alleged that any of the individual defendants created policies directing subordinates to implement the conditions of which he complains against him or any other inmate. As such, Plaintiff's stand-alone Eighth Amendment claims related to his conditions of confinement, to the extent they were alleged, will be dismissed. *See Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 364 (S.D.N.Y. 2011) ("Nevertheless, proceeding pro se does not otherwise relieve a litigant from the usual requirements of summary judgment, and a pro se party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment.") (citing cases).

Similarly, Plaintiff's claims for deliberate indifference against Butkiewicus, McGill, Levesque, Clapp, Marcial, Salius, Bradway, Lantz, Murphy, and Light must be dismissed because Plaintiff has failed to allege non-conclusory facts related to the subjective element of the claim. Plaintiff's Amended Complaint merely alleges that these defendants *either knew or should have known* of his conditions, but fails to state any facts to support these allegations. *See* Am. Compl. ¶ 55 [Rec. Doc. 30, at 13]. Such conclusory allegations are insufficient to impart liability under any of the five *Colon* categories because "it is necessary to establish . . . [the] official's *personal involvement* in the alleged constitutional violation." *West v. Whitehead*, 2008 WL 4201130, at *12 (S.D.N.Y. Sept. 11, 2008) (emphasis added). As set out above, it "is not enough that the prison official should have known of the risk to the prisoner; he or she must have been actually aware of it." *See Bell*, 856 F. Supp. 2d at 399. Plaintiff's Amended Complaint does not sufficiently allege that any—let alone all—of the individual defendants were aware of the allegedly unconstitutional conditions.

To the extent that Plaintiff's Affidavit, appended to his Opposition Memorandum, more explicitly alleges that defendants "McGill, Butkiewicus, Light, Levesque, Marcial, Murphy, Lantz, and Bradway were well aware of these harmful conditions and deliberately allowed [him] to be continuously subjected to these harmful conditions," Dorlette Aff. ¶ 16 [Rec. Doc. 62-7, at 16], Plaintiff has adduced no specific facts to support these broad, conclusory, and speculative allegations that these defendants had knowledge of the ongoing conditions or specific incidents of conduct. "[B]road, conclusory allegations that a high-ranking defendant was informed of an incident are also insufficient to impose liability," *West*, 2008 WL 4201130, at *25 (quoting *Vega v. Fox*, 457 F. Supp. 2d 172, 182 (S.D.N.Y. 2006)), as a party "may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Caractor*, 2013 WL 2922436, at *4 (quoting *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010)). Plaintiff's supervisory liability claims cannot be viewed as anything more than conclusory allegations of awareness on the part of high-ranking officials at NCI. *See, e.g.*, Pl. Opp'n Mem. [Rec. Doc. 62-2, at 13] ("[Defendant Murphy] reviewed all of the paperwork regarding both of Plaintiff's ad. seg. placements . . . [and he] allowed the Plaintiff to remain punished unlawfully in segregation."). Even if Plaintiff had actually alleged facts that amounted to more than mere speculative assumptions, numerous courts have held that a "prisoner's allegation that a supervisory official failed to respond to a grievance is insufficient to establish that official's personal involvement" even within the confines of the five *Colon* categories. *See, e.g., Smith v. Rosati*, 2013 WL 1500422, at *6 (N.D.N.Y. Feb. 20, 2013). As such, the Court will grant Defendants' Motion for Summary Judgment in favor of Butkiewicus, McGill, Levesque, Clapp, Marcial, Salius, Bradway, Lantz, Murphy, and Light and dismiss Plaintiff's supervisory liability

claims related to the conditions of his confinement during his initial placement in administrative confinement in July 2008.

### G. PLAINTIFF'S DUE PROCESS CLAIMS RELATED TO HIS JANUARY 2009 READMISSION INTO ADMINISTRATIVE SEGREGATION[35]

Plaintiff alleges that the process related to his formal readmission into administrative segregation on January 26, 2009, as a pre-trial detainee deprived him of his "most basic" pre-trial rights under the Fourteenth Amendment: the right not to be deprived of liberty without due process of law and the right not to be punished prior to the adjudication of his guilt. Pl. Opp'n Mem. [Rec. Doc. 62-4, at 47]. Defendants' Memorandum only addresses Plaintiff's claim that "he was improperly classified as an administrative segregation prisoner" when he was readmitted at NCI. Def. Mem. [Rec. Doc. 54-23, at 14]. As Plaintiff points out several times, however, "he has not challenged solely his classification" in alleging due process violations related to his readmission into administrative segregation. Pl. Opp'n Mem. [Rec. Doc. 62-3, at 31]. Rather, the Court construes Plaintiff's due process claims related to his January 2009 readmission as two separate claims: first, Plaintiff challenges the procedure that led to his readmission into administrative segregation, in which he alleges that he did not receive due process prior to his readmission, *id.* at 45-47; second, he alleges that the conditions imposed on him as a pre-trial detainee in administrative segregation impermissibly punished him in violation of his due process rights. *Id.* at 51; *see* Am. Compl. ¶¶ 57-61 [Rec. Doc. 30, at 13-14] (challenging his

---

[35] As previously set out, Plaintiff states that he was readmitted into administrative segregation at NCI on December 30, 2008, after being transferred from BCC. Dorlette Aff. ¶ 18 [Rec. Doc. 62-7, at 11]. Defendants agree that he was readmitted to administrative segregation on December 30, 2008, after returning to NCI. *See* Def. 56.1 St. ¶ 8 [Rec. Doc. 54-29, at 2]; *see also* Salius Aff. ¶¶ 35-36 [Rec. Doc. 54-20, at 7-8]. His due process claims, however, focus on the conduct of NCI officials before, during and after the January 15, 2009, hearing and subsequent authorization for readmission to administrative segregation on January 26. The Court will therefore refer to Plaintiff's claims related to his readmission as occurring in January 2009.

readmission); *id.* ¶ 69 [Rec. Doc. 30, at 16] (challenging his conditions of confinement).[36]

Defendants did not specifically move for summary judgment on the validity of Plaintiff's pre-trial conditions of confinement due process claims.[37]

As with an incarcerated inmate, to present a valid due process claim, a pre-trial detainee "must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Ortiz*, 380 F.3d at 654. Liberty interests of pre-trial detainees are protected by the Fourteenth Amendment, *see Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979), and "may arise from two sources-the Due Process Clause itself and the laws of the States." *Greene v. Garcia*, 2013 WL 1455029, at *4 (S.D.N.Y. Mar. 26, 2013) (quoting *Hewitt*, 459 U.S. at 466).

### 1. Plaintiff's Due Process Claims Related to the Procedures Before, During, and After His January 15, 2009, Readmission Hearing

"It is well established that the administrative classification of prisoners does not give rise to a protectable liberty interest under the Due Process Clause itself," *id.* (citing *Hewitt*, 459 U.S. at 468, and *Lowrance v. Achtyl*, 20 F.3d 529, 535 (2d Cir. 1994)), but a pre-trial detainee's "liberty interest may also be created by state statute or regulation," *see Adams*, 1999 WL 959368, at *5. The Court finds that Plaintiff possessed a protectable state-created liberty interest arising out of the same mandatory language of Directive 9.4 previously cited in relation to his 2008 due

---

[36] Although Plaintiff's Amended Complaint labels his pre-trial conditions of confinement "cruel and unusual," Am. Compl. ¶ 69 [Rec. Doc. 30, at 16], in accordance with *Triestman*, 470 F.3d at 474-75, the Court construes Plaintiff's claim as a due process challenge rather than an Eighth Amendment challenge. Pre-trial detainee's claims related to their conditions of confinement are analyzed under the Fourteenth Amendment's Due Process Clause as opposed to the Eighth Amendment. *See Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979).

[37] Defendants moved for summary judgment solely on Plaintiff's claims related to the conditions of confinement he faced as a convicted prisoner from June to December 2008, *see* Def. Mem. [Rec. Doc. 54-23, at 36]. As set out in note 36, conditions of confinement claims by convicted prisoners are analyzed under the Eighth Amendment standard not applicable to pre-trial detainees. *See Bell*, 441 U.S. at 535 n.16.

process claims.[38]  The Court notes that to the extent that Plaintiff's readmission was construed as an "automatic placement" pursuant to § III(A) of the DOC's Classification Manual,[39] the placement would be governed by § 12(E) of Directive 9.4, which similarly uses mandatory language in requiring a hearing *prior to* any such "automatic placement" of an inmate in segregation. Admin. Directive 9.4, § 12(E) [Rec. Doc. 51-11, at 9] ("Automatic placement of an inmate on Administrative Segregation . . . *shall require* a hearing to be conducted in accordance with the provisions of this section [§ 12 of Directive 9.4].") (emphasis added).  The Court observes again that Defendants' Memorandum fails to address the applicability of any section of Directive 9.4 as the source of a state-created liberty interest.

Plaintiff alleges the process he received before, during, and after his January 15, 2009, hearing was constitutionally deficient in seven separate ways: (1) that the notice he received prior to the hearing was inadequate, insufficient, and unfair, Am. Compl. ¶ 62 [Rec. Doc. 30, at 15]; (2) that the prison staff advocate assigned to assist him at the 2009 hearing failed to perform the duties of that role and denied him "adequate/proper assistance," *id.* ¶¶ 63-64 [Rec. Doc. 30, at 15]; (3) that the hearing itself was unfair because he was denied the opportunity for sufficient

---

[38] "*Sandin* . . . 'does not apply to pretrial detainees and . . . pretrial detainees need not show that an imposed restraint imposes atypical and significant hardships to state deprivation of a liberty interest protected by procedural due process.'" *Patterson v. City of N.Y.*, 2012 WL 3264354, at *4 n.5 (S.D.N.Y. Aug. 9, 2012) (quoting *Iqbal v. Hasty*, 490 F.3d 143, 163 (2d Cir. 2007), *rev'd on other grounds by Ashcroft v. Iqbal*, 556 U.S. 662 (2009)).

[39] The January 8, 2009, Notification of Hearing Form referred to by Defendants' Memorandum stated that Plaintiff's January 15 hearing to consider Plaintiff's readmission to administrative segregation would be conducted because "[a]ccording to the DOC Classification Manual, any inmate who discharges while on Administrative Segregation (A/S) shall be readmitted at that status." *See* 2009 Hearing Package [Rec. Doc. 54-9, at 2].  Defendants did not cite the specific provision of the Classification Manual that states this requirement in their Memorandum of Law or Rule 56.1 Statement.  The Court, on its independent review, discovered the relevant provision in § III(A) of the Manual: "An inmate who was discharged or paroled from Administrative Segregation . . . *shall be* re-admitted in that status *and reviewed within fifteen days* of readmission for the appropriateness of continuation in that status." Conn. Dep't of Corr. Classification Manual, at 4, *available at* http://www.ct.gov/doc/lib/doc/PDF/PDFReport/ ClassificationManualLibraryCopy.pdf (emphasis added).  The Court notes that the Manual does not appear to be a state statute or regulation, nor do Defendants contend that it has such force and effect of law.  The Court therefore views § 12(E) of Directive 9.4 as the operative state regulation directing Plaintiff's readmission to administrative segregation.

preparation, to call witnesses, or to examine the evidence against him, *id.* ¶¶ 65-67 [Rec. Doc. 30, at 16]; (4) that he was provided inadequate, insufficient, and vague notice as to the basis for his formal authorization for continued confinement in segregation after his hearing, *id.* ¶ 68 [Rec. Doc. 30, at 16]; (5) that he was not notified of his "right to appeal" the transfer decision, *id.*; (6) that his appeal was improperly denied, *id.*; and (7) that his status in administrative segregation was not reviewed periodically, *id.* ¶¶ 49-50 [Rec. Doc. 30, at 11].

Although the Court concludes that Plaintiff possessed a state-created liberty interest in avoiding readmission to segregation as set out above, the Court need not determine whether Plaintiff was deprived of this liberty interest during the readmission procedure due to allegedly constitutionally deficient process as the Court finds that Defendants are entitled to qualified immunity on Plaintiff's 2009 due process claims. Plaintiff's possession of a state-created liberty interest in avoiding readmission to administrative segregation was not clearly established in January 2009. As set out previously in section III(D)(2), controlling authority at that time indicated that Plaintiff, as a Connecticut inmate, convicted or otherwise, did *not* possess any constitutionally- or state-created liberty interest in his classification and transfer to administrative segregation. The federal due process rights to which he was entitled, if any, were not defined with reasonable specificity. Moreover, it was objectively reasonable for Defendants to believe that Plaintiff did not possess a liberty interest and therefore was not entitled to federal due process rights in his classification and transfer to administrative segregation. Accordingly, Defendants are entitled to qualified immunity on Plaintiff's 2009 due process claims. *See McGarry*, 687 F.3d at 512. The Court will grant Defendants' Motion for Summary Judgment against Plaintiff on his seven federal due process claims related to his January 2009 readmission to administrative segregation and dismiss those claims.

## 2. Plaintiff's Due Process Claim For Failure to Correct Due Process Violations on Appeal

Plaintiff alleges a separate claim against defendants McGill,[40] Marcial, Lantz, Murphy, and Light for their "failure to correct" on "appeal" the due process violations he alleged had occurred before, during and after the January 15, 2009, hearing. Am. Compl. ¶ 72 [Rec. Doc. 30, at 17]; Dorlette Aff. ¶ 20 [Rec. Doc. 62-8, at 20]. Plaintiff alleges that these defendants "were all presented with appeals and complaints regarding [his] constitutional violations which were ongoing, however, they chose to allow [his] constitutional rights to be continuously violated." *Id.* Defendants did not address this claim specifically, nor did they move for summary judgment on Plaintiff's "failure to correct" claim on the basis that it fails to state a cognizable stand-alone due process claim. Plaintiff's Opposition Memorandum cites no authority in support of his argument that it is a federal due process violation to fail to "correct" due process violations on appeal. The "law is well established, that 'a failure to process, investigate or respond to a prisoner's grievances does not in itself give rise to a constitutional claim.'" *Thorne v. Cuevas*, 2012 WL 1050056, at *5 (D. Conn. Mar. 28, 2012) (citing *Swift v. Tweddell*, 582 F. Supp. 2d 437, 445-46 (W.D.N.Y. 2008)). This is so because state prisons' "inmate grievances procedures are undertaken voluntarily by the states" and are "not constitutionally required." *Swift*, 582 F. Supp. at 445. The Court finds that there is no cognizable federal due process claim based on Defendants' "failure to correct" previously alleged due process violations. The Court will

---

[40] Although Plaintiff's Affidavit incorporates defendant McGill under the claim related to the failure to correct due process violations without specifically naming him under that claim in his Amended Complaint, the Court need not determine whether Plaintiff actually asserted the claim against McGill, as the claim related to the failure to correct due process violations will be dismissed against all defendants for the reasons set forth hereinafter.

therefore grant summary judgment *sua sponte* against Plaintiff on his due process claim for "failure to correct" his alleged due process violations on "appeal" and dismiss that claim.[41]

### 3. Plaintiff's Due Process Claims Related to His Conditions of Confinement as a Pre-Trial Detainee

As set out previously, Plaintiff does not only allege that the procedures used to classify and formally readmit him into administrative segregation in January 2009 constituted due process violations. He also alleges that the conditions he faced after being readmitted into administrative segregation at NCI in January 2009 amounted to unconstitutional punishment because at the time he was a pre-trial detainee as opposed to a convicted prisoner. Pl. Opp'n Mem. [Rec. Doc. 62-5, at 49-51]; *see* Am. Compl. ¶ 69 [Rec. Doc. 30, at 16].[42] Plaintiff also brought a "deliberate indifference/supervisory liability" claim against McGill, Levesque, Clapp, Marcial, Bradway, Lantz, Murphy, and Light stemming from their alleged "deliberate[] disregard[]" of information that Plaintiff was being punished as a pre-trial detainee in violation of his due process rights. Am. Compl. ¶ 70 [Rec. Doc. 30, at 17].

Under the Due Process Clause of the Fourteenth Amendment itself, pre-trial detainees have a liberty interest in being free from punishment prior to their conviction. *Bell*, 441 U.S. at 535. Accordingly, "the conditions of confinement of a pretrial detainee are constitutional unless

---

[41] The Court concludes granting summary judgment *sua sponte* on Plaintiff's "failure to correct" claim is compelled yet again by Defendants' failure to address the claim. Plaintiff's verified Amended Complaint and Affidavit set forth factual allegations that the defendants "failed to correct" the alleged due process violations during his appeals. However, prevailing jurisprudence does not recognize such a claim as cognizable under 42 U.S.C. § 1983. *See Thorne*, 2012 WL 1050056, at *5. As Plaintiff's claim would fail as a matter of law, an additional opportunity to marshal evidence in support of his claim would not alter the disposition of this claim. The Court therefore finds that exercising its discretion to grant summary judgment *sua sponte* is appropriate under the circumstances without prior notice to Plaintiff. *See Garanti*, 697 F.3d at 64.

[42] The section of Plaintiff's Amended Complaint stating his 2009 conditions of confinement claim incorporates by reference the paragraphs of his Amended Complaint listing the seven specific conditions he claimed were "cruel and unusual" during his initial 2008 confinement in administrative segregation. *See* Am. Compl. ¶ 69 [Rec. Doc. 30, at 16]. As the Court stated in relation to Plaintiff's 2008 conditions of confinement claim, it will not consider any additional conditions listed for the first time in Plaintiff's Opposition Memorandum and the attached Affidavit as Plaintiff failed to allege those conditions prior to the summary judgment stage. *See Scott*, 651 F. Supp. 2d at 229.

they constitute punishment." *Torres v. Stewart*, 263 F. Supp. 2d 463, 468 (D. Conn. 2003). "Not every disability imposed during pretrial detention . . . amounts to 'punishment' in the constitutional sense." *Id.* (quoting *Bell*, 441 U.S. at 537) (internal quotation marks omitted). If a "particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" *Id.* (quoting *Bell*, 441 U.S. at 539).

Defendants' Memorandum did not specifically address the validity of Plaintiff's claims that the specified conditions of confinement to which he was subjected following his January 2009 readmission to administrative segregation amounted to "punishment" in violation of his due process rights as a pre-trial detainee beyond the other affirmative defenses previously discussed in relation to Plaintiff's other claims. Defendants did move for summary judgment on all of Plaintiff's supervisory liability claims, related to both his initial placement and readmission to administrative segregation, contending that the individual defendants were not "directly or significantly involved," although that personal involvement defense was not aimed with specificity at Plaintiff's pre-trial conditions of confinement claims. Def. Mem. [Rec. Doc. 54-23, at 13].

The Court will grant Defendants' Motion for Summary Judgment against Plaintiff on his pre-trial detainee conditions of confinement claims against all individual defendants because Plaintiff has again failed to allege any facts indicating that any of the defendants actually created, produced, or implemented the conditions or personally subjected Plaintiff to them. *See Roseboro*, 791 F. Supp. 2d at 364.[43]

---

[43] To the extent that Plaintiff alleges defendant Lantz's involvement stemmed from his position as the "creator of the policies" that "showed absolutely no consideration of the rights of pre-trial detainees," Plaintiff's allegations regarding Lantz's role as policy creator relate *solely* to the procedures used to transfer him to segregation, and *not* to any policies that directed the imposition of specific conditions while Plaintiff was confined.

The Court will also grant Defendants' Motion for Summary Judgment on Plaintiff's supervisory liability claims stemming from his 2009 conditions of confinement claim. Although Plaintiff alleges that the defendants "deliberately disregarded . . . information indicating that plaintiff's constitutional rights were being violated," Am. Compl. ¶ 70 [Rec. Doc. 30, at 17], he fails to provide *any* evidence that these individual defendants possessed specific information from him or about him. Rather, he merely conclusorily alleges, in what amounts to naked speculation, that these defendants "knew, or should have known" that his rights as a pre-trial detainee were being violated. *Id.* As previously set out, however, "it is not enough that the prison official should have known of the risk to the prisoner." *See Bell*, 856 F. Supp. 2d at 399.

Plaintiff's Opposition Memorandum attempts to specify—albeit in speculative, conclusory fashion—that several of the individual defendants did indeed possess knowledge of his conditions of confinement and failed to act on such information to remedy his situation.[44] The Court again notes that "[b]road, conclusory allegations that a high-ranking informant was informed" are insufficient, *see West*, 2008 WL 4201130, at *25, and a *pro se* litigant's "bald assertion[s], unsupported by evidence, [are] not sufficient to overcome a motion for summary judgment." *Caractor*, 2013 WL 2922436, at *4. Had Plaintiff proffered specific evidence of individual defendants receiving specific reports, information, or appeals he made, numerous courts have held that a "prisoner's allegation that a supervisory official failed to respond to a

---

*See, e.g.*, Pl. Opp'n Mem. [Rec. Doc. 62-2, at 27] ("Specifically, defendant Lantz created Admin. Dir. ("A.D") 9.4 . . . that governed Plaintiff's placement into 'admin. seg.' as a pre-trial detainee.").

[44] *See, e.g.*, Pl. Opp'n Mem. [Rec. Doc. 62-2, at 28] ("[Murphy] received reports as to Plaintiff's placement in segregation . . . while [he was] a pre-trial detainee" and "allowed the Plaintiff to remain punished unlawfully in segregation."); *id.* ("[McGill, Light, and Bradway] knew of the violations of the Plaintiff's rights but failed to correct them upon appeals[,] grievances, or reports of the violations."); *id.* at 30 ("Defendants McGill and Light in their respective positions were responsible for receiving information regarding the Plaintiff's re-placement in seg. [sic] as a pre-trial detainee . . . . These two named defendants denied Plaintiff's requests and appeals for removal from this segregation and sort of harsh punishment . . . despite their having knowledge of inter alia this violation of the Plaintiff's substantive due process rights.").

grievance is insufficient to establish that official's personal involvement" even within the confines of the five *Colon* categories. *See, e.g., Rosati*, 2013 WL 1500422, at *6; *Thorne*, 2012 WL 1050056, at *5 ("Thus, a supervisory official's mere receipt of a letter complaining about unconstitutional conduct is not enough to give rise to personal involvement on the part of the official."). Accordingly, the Court will grant Defendants' Motion for Summary Judgment on Plaintiff's supervisory liability claims related to his 2009 claims challenging the conditions of confinement he faced as a pre-trial detainee.

## IV. CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment [Rec. Doc. 54] will be granted, and on those claims on which Defendants failed to move for summary judgment, the Court will enter Judgment dismissing with prejudice all of Plaintiff's claims against all Defendants at Plaintiff's cost.

Tucker L. Melançon
United States District Judge

September 4, 2013
Bridgeport, CT